[Crim. No. 826.   Fourth Dist.   Dec. 19, 1950.]

THE PEOPLE, Respondent, v. ANNA ROSE RIELLY, Appellant.

John M. Nairn and Don W. Kinney for Appellant.

Fred N. Howser, Attorney General and Elizabeth Miller, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant shot and killed her mother on March 27, 1950. She and her husband lived with the mother in a house belonging to the mother. While she was cleaning her mother's room a man came to collect two payments on her automobile. She agreed to make one payment and to meet him an hour later to arrange for easier payments. She gave him a check for $102, knowing she had no money· in the bank. She had previously tried, without success, to get her mother to mortgage the house as security for her debts. When the man left, she asked her mother for financial help. The mother refused and began to criticise her about the way she was handling the finances of her family. She resumed her cleaning in the mother's room, and the mother continued with her criticism. She then picked up a .22 rifle which was in the mother's room, went to the kitchen door, and shot her mother in the back of her head.

The defendant then drove to the office of her brother-in-law and told him she had just killed her mother. In reply to his question as to what had happened she told him that a man had called to collect a delinquent automobile payment; that her mother injected herself into the conversation, berating the defendant and her husband for their inability to handle their finances; that she tried to quiet her mother and keep her from making a scene; that finally she wrote a check for $102 and the man left; that her mother "increased her tirade against her"; that she was overwrought and upset and went into the bedroom and her mother went into the kitchen; that she started vacuuming to relieve her tension; that she could still hear her mother talking over the noise of the vacuum cleaner; that as she worked she noticed the gun in the bedroom; that she picked up the gun, walked to the door and fired one shot; and that she did not know why she did it. The brother-in-law also testified that the defendant said she had asked her mother for help several times before, that her mother knew she was desperate and needed help, and that she had asked the mother to let her borrow money on the house to clear up her debts.

A deputy sheriff, who was called in by the brother-in-law, asked the defendant what happened. She replied: "I have stood things just as long as I could, and I shot my mother." A little later she told this officer that she had had financial troubles, that she had asked her mother for aid and been refused, and that she had "shot her with a .22 rifle."

Later the same day, the defendant told another officer that she had wanted her mother to mortgage the property so she could pay some bills; that her mother refused and argued; that while she did not get mad very easily, "I think I came to a head and I couldn't stand any more"; and that she had got the gun and shot her mother. She also told a deputy coroner that she had asked her mother for help several days before; that the visit of the collector brought it to a head; that it was bothering her terribly and it was more than she could take; that she and her mother did not argue very long; that after she was convinced her mother was not going to give her financial assistance she went into the bedroom and started to work; and that she saw the gun and just picked it up and shot her mother.

The defendant was charged with murder, to which she pleaded not guilty and not guilty by reason of insanity. On the first issue the jury found her guilty of murder in the

second degree, and she then withdrew her plea of not guilty by reason of insanity. She has appealed from the judgment which followed.

■ The only point raised is that the court committed prejudicial error by excluding "evidence tending to show the defendant's state of mind at the time of the homicide." The record shows no definite exclusion of evidence except with respect to some suicide notes. Otherwise, the appellant relies on remarks and general rulings of the court.

In his opening statement counsel for the appellant said: "We contend the evidence will show that the defendant was not in a state of mind so she was legally capable of committing the act, or committing any crime." The court remarked that this contention was applicable on the other issue as to insanity but not here, and that "The only state of mind you can show on this is, she was unconscious when she did the act." The court went on to say that the defendant's state of mind was not a defense to this first plea, but that in this proceeding she could show that she was unconscious or did not know what she was doing when she fired the shot. Counsel then stated "What we intend to prove is she could not form the requisite intent at that time, because of the fact——" The court interrupted saying there were several degrees of this crime, suggesting that they "get away from the state of mind except on the question of forming the intent," and stating that the state of mind "is not material except as to the question of the degree of the crime, or if she was completely blacked out, and did not know she did it." Counsel then said: "That is what we contend, precisely." Counsel then made a long statement saying that the defendant had been under extreme financial difficulties for years, living with her mother in a small house with her mother taking control; that on this morning when the collector left she had appealed to her mother for help and was rewarded by a tirade against her husband and their lack of financial ability; that since her marriage the mother had disliked the defendant's husband, and had tried to get her to get a divorce; that the mental strain she had suffered over this period of years had built up until she was near the breaking point; and that at that time she did not know what she was doing. The court interrupted to say "That would be admissible if she didn't know what she was doing under the plea of insanity." Counsel then concluded by saying "She was unconscious."

After the People rested the defendant took the stand. She was first asked whether her mother had ever approved of her marriage. She replied "No, sir." Counsel then repeated the question, and the court stated that this was not material, but did not strike out the answer. The court then said that a lot of these things could be shown under the other plea but that going back into the history would not be material here. Counsel stated "We would like to show the circumstances of mitigation and what led up to it," and the court replied that this could not be done "except what happened that day." Counsel then asked: "Do you want me to make an offer of proof?" The court replied: "No, you have stated what you wanted to prove." Counsel then went back to the morning in question. The defendant testified that after the man from the bank left she asked her mother for help and was refused; that "I don't argue with anybody,—I was not mad at her— I always tried to do what she said. I just wanted help, but when she told me no, that was enough. She didn't have to go on talking, but she always talked. I never do anything right."; that she didn't argue with her mother at all; that "I just left her, and she didn't stop talking, she just keeps it up all the time, any time over anything all the time."; that the next thing she remembered was that her mother was slumped over; and that "I didn't know what I did."

The defendant was asked if it was not a fact that she had tried to commit suicide three days before, and she replied "Yes". She then testified that she left some suicide notes but she did not know where these notes were now. Her counsel asked the district attorney to produce these notes if he had them. The court then said these notes would not be admissible on this hearing, but would be upon the plea of insanity.

On cross-examination the defendant testified that prior to that day she had requested her mother to allow her to use the house for security; that she knew she had no money in the bank when she wrote the check; that she wrote it with the expectation that her brother-in-law or mother would help her; that she did not become angry when her mother refused to help her; that the last thing she remembered after the collector was there was while she was finishing her work in the bedroom; that she saw the gun back of the door; that she did not remember picking it up and firing at her mother; and that "I was vacuuming, then I knew my mother was slumped and I had the gun, I didn't know what happened after that. The next thing I knew I was here in jail." She then testified that

she did not remember talking with her brother-in-law, talking to the various officers, or making any of the statements to them which had been written up and which were read to her.

The appellant now contends that "the proffered evidence" was to prove that she did not have at the time the act was committed "the required mental state, that is, malice aforethought"; that the opening statement of counsel informed the court of the type of evidence he would introduce for the purpose of showing "lack of the requisite mental state of malice aforethought and that the defendant was unconscious at the time of the killing and thus incapable of committing any crime"; that she was not allowed to produce evidence to dispel the showing of malice aforethought; and that she acted "under such a heat of passion and could not form the necessary element of malice aforethought." She relies particularly on *People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53] ; *People* v. *Letourneau,* 34 Cal.2d 478 [211 P.2d 865].

It is argued that the suicide notes were admissible to show that she was in an unsettled state of mind several days before the shooting; that the court refused to admit evidence showing her quarrels with her mother, and her mother's disapproval of her marriage and her financial management; and that it was error to exclude evidence that she was acting under heat of passion when the shot was fired.

From the opening statement and from defendant's testimony, it clearly appears that the defense relied on was that the defendant was unconscious at the time. In view of that defense, no reversible error in excluding evidence here appears (*People* v. *Danielly,* 33 Cal.2d 362 [202 P.2d 18]). No mention was made in the opening statement of any claim that the act was committed under any sudden heat of passion, and no evidence was rejected which had any material bearing on such an issue. Evidence as to the intent involved in "malice aforethought" was not excluded. While some of the court's remarks could have been better expressed, he did not rule that no evidence would be received with respect to any mental state of the defendant. While he tried to keep the issue of insanity out of this proceeding, he told counsel that evidence with respect to the state of mind was admissible on the question of forming an intent, for the purpose of fixing the degree of the crime, and to show whether she was unconscious. When the first question arose, on defendant's testimony, her counsel said he would like to show the circumstances of mitigation and what led up to it, and the court said he could not do that

"except what happened that day." Counsel was in no way limited in introducing evidence as to what happened on that day. No attempt was made to show that any heat of passion existed at the time, and no offer or suggestion of proof was made in that connection. That state of mind, the existence of a heat of passion, was the material element, and not the complete history behind it. (*People* v. *Danielly*, 33 Cal.2d 362 [202 P.2d 18].)

The defendant, who had no difficulty in remembering everything up until she saw the gun in her mother's room, testified as to what occurred up to that time. She testified that she was not angry when her mother refused to help her; that she just left her and went back to her work; that she could still hear her mother talking; that the next thing she remembered was that her mother was shot and she had the gun in her hand; and that she didn't know what she did. She was allowed to testify as to what occurred, and no other material evidence on heat of passion was offered. There was no dispute as to the basic facts, and it was admitted that she shot her mother. No exclusion of material evidence, or prejudicial error, appears from the record.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.