[Crim. No. 740.    Fourth Dist.    Mar. 23, 1951.]

THE PEOPLE, Respondent, v. GLORIA GOULD BLACK, Appellant.

Thomas Whelan and Ann Wansley for Appellant.

Edmund G. Brown, Attorney General, and Ariel C. Hilton, Deputy Attorney General, for Respondent.

BARNARD, P. J. — The defendant was charged with the murder of her husband. A jury found her guilty of manslaughter and she appeals from the judgment and from an order denying her motion for a new trial.

The defendant and her husband, who was a dentist, lived in Escondido. About 1:30 p.m. on March 7, 1950, she telephoned to the office of Dr. Adams saying that her husband was lying on the floor and that she wanted the doctor to come

at once. The doctor arrived at the Black home shortly before 2 p.m. He found the body of Dr. Black on the kitchen floor in a twisted position, with the upper portion of the body lying on its left side. He first noticed a wound across the nose, noting that it was a fresh wound but not bleeding at that time. He rolled the body on its back, pulled up the shirt, and using a stethoscope and other tests determined that death had occurred. He told the defendant her husband was dead, remarking that it was probably a heart attack. The defendant then called the doctor's attention to a wound 12 inches below the left armpit of the deceased, which he had not previously noticed. The doctor looked at the wound and wondered whether it was superficial or deep. He then noticed a knife with a long narrow blade, which he had not before seen, and picked it up. There were signs of blood the full length of the blade, and he concluded from the appearance of the knife that the wound was deep. The doctor noticed that the deceased was holding a few common matches in his clenched left hand, and that an unlighted cigarette lay on the floor near the hand. He phoned for a mortician and, when he came, asked him to keep his eyes open. The doctor again picked up the knife, showed it to the mortician, and then threw it on the floor near where he had found it. The doctor then left, after asking the mortician to stay until the coroner came. The coroner and other officers arrived, observations were made of the surrounding conditions, and the defendant was questioned during the afternoon and later.

It conclusively appears that death occurred as a result of the wound on the left side of the body below the armpit, death being caused by excessive internal bleeding, and that this wound was caused by the knife found under or near the body. The knife had pierced the abdominal muscles, the intercostal muscle, the diaphragm, and the wall of the stomach. There was evidence that it would take considerable force to drive the knife in in order to cause this wound. The wound went straight in and not at an angle and there was no wound of exit, the knife having been withdrawn.

While there are some inconsistencies in the story told by the defendant she at all times told essentially the same story to the officers and on the stand. She testified that her husband had had two drinks before going to the office that morning; that she had pleaded with him not to drink any

more because they intended to go to San Diego about noon; that he returned about 11 a.m. appearing to be under the influence of liquor; that he placed some packages in their car and then she noticed him putting a bottle of gin in his pocket; that she tried to get the bottle and he pushed her down on the steps; that she reminded him that he had broken her ribs once and he became angry; that he then left in the car; that thinking he was in no condition to go to San Diego she changed her clothes, putting on a pair of slacks and a blouse; that her husband returned later and she did not know how long he had been gone; that she heard a noise in the kitchen like he was ''bumping'' into something and then he went outside and sat in the patio; that she went out and tried to get him to help her with their income tax but he refused to do so; that she went into the house and saw her husband going toward the lath house; that she saw him take hold of something trying to steady himself; that he had been wearing his glasses when she talked to him in the patio; that she went into the back bedroom and later heard him come into the kitchen; that he said he was going to make a sandwich; that his speech was thick and not normal; that she heard a rattle when he took a knife from the knife rack; that she heard him at the bread drawer and he asked where the mustard was; that she knew he was stumbling because of the way he went to the bread drawer; that she thought she heard a fall followed by a moment of silence; and that she then came into the kitchen and found him on the floor, lying on his side.

She further testified that she had not seen the knife at this time and had not turned him over; that she had noticed blood on his face and that he was breathing; that she asked him to get up, thinking he had fainted; that she went to the phone and called Dr. Adams' office; that just as she was calling the third time the doctor came; that Dr. Adams rolled the deceased over on his back and after pushing up his shirt and listening, told her that he was dead and that it must have been a heart attack; that she threw herself on the body trying to kiss him and was raised up by Dr. Adams; that she then observed the wound on his side and called Dr. Adams' attention to it; that Dr. Adams felt around under the body and came up with the knife in his hand; and that she told Dr. Adams that her husband had said he was going to make a sandwich. She denied that she had stuck the knife into Dr. Black's body.

█ The defendant testified that she had carried on a conversation with her husband all the time after his last return to the house and that she knew no one else was present. There was no direct evidence as to the stabbing itself and the case rests largely on circumstantial evidence. There was a great deal of evidence of quarreling and some violence or threats of violence between these parties over a number of years. There was evidence that both drank too much, that their quarrels were largely the result of drinking, and that the defendant was frequently intoxicated, possibly more often than her husband. At one time he had broken two of her ribs and at another had injured her spine. She admitted throwing things at him on several occasions. There was evidence that on three occasions she had threatened him with a knife, which was taken away from her; that on a number of occasions she had called in people saying her husband was intoxicated when it developed that she was intoxicated and he was not; and that during their quarrels she frequently talked the loudest and he was trying to move away or to quiet her. Seven witnesses testified that they heard the Blacks arguing and screaming at each other for some 10 minutes shortly after 1 o'clock on that day. One neighbor testified that she heard enough to know that the argument concerned something about the income tax.

While the doctors testified that the laceration on the deceased's nose would necessarily have caused excessive bleeding, very little blood was found around the body. There was a small amount of blood on the floor where the face had lain. There was very little blood on the deceased's clothing. There were blood stains on the deceased's shirt where a sharp instrument had penetrated, but these were diffused as though sponged by water or other solvent, and the shirt was wet. A spot of blood was found inside a bread wrapper around some bread, and one slice of bread was out on the table. The defendant said she had done no mopping that day, but a mop which was dry when a servant left about 11:45 a.m. on that day was wet when found by the officers. The evidence rather conclusively shows that a considerable attempt to clean up had been made before Dr. Adams arrived at the scene. The defendant was the only person present at the time when this could have been done. The pocket on the blouse worn by the defendant was torn and a button from the chest of this blouse was missing. This

button was found on the kitchen floor. The evidence shows that it had been torn from this blouse, taking some of the material with it. The fact that this button was not noticed by the officers on their first inspection of the premises and was found several hours later, relied on by the defendant, merely goes to the weight of this evidence. The deceased's glasses were not found, but two months later a broken pair was found in the lath house. The defendant argues that the deceased might have cut his nose on a nail or sharp piece of wood when he went to the lath house. However, the officers were unable to find any blood there, or between that point and the house, and there was no such blood on the deceased's clothing as would naturally be expected if this had occurred.

There was evidence that on March 9, 1950, the defendant told her sister-in-law that "I did it in self defense." A matron in the sheriff's office testified that at the defendant's arraignment on March 9, the defendant was crying and was very disturbed when her attorney arrived; that at that time she said to this attorney "You've got to get me out of this. You can't let them do anything to me. I want to plead self defense"; and that the attorney told her to "shut up" and not talk so much.

The appellant contends that the evidence is insufficient to sustain the verdict and that the verdict is contrary to law. While admitting that the evidence is sufficient to sustain the verdict if the corpus delicti was established, it is urged that the corpus delicti was not established and that it follows that the verdict is contrary to law and that the evidence is insufficient. It is argued that while the death is undisputed there was no evidence to show criminal agency since it failed to show that the appellant had the knife in her hand on the day in question, and since there was no evidence that the wound causing death could not have been self-inflicted or the result of accident.

The rules here applicable are stated in *People* v. *Ives,* 17 Cal.2d 459, 463 [110 P.2d 408], as follows:

"The *corpus delicti* may be proven by circumstantial evidence, and the reasonable inferences drawn therefrom. To warrant a conviction it must be proven to a moral certainty and beyond a reasonable doubt, but it is not necessary that it should be so proven before other evidence is introduced which corroborates it or strengthens reasonable inferences drawn therefrom. If a *prima facie* case is presented that the

deceased met his death by means of an unlawful act of another, the evidence is sufficient. (Citing cases.) . . .

"To prove a *prima facie* case of *corpus delicti*, all that was required was to show a reasonable probability that a criminal act of another had been the direct cause of the death of Sherrard."

While some doctors expressed the opinion that the wound causing death could have been self-inflicted or could have been accidentally caused by the deceased falling upon the knife, it does not follow that such a thing is probable, especially in view of the other evidence. While a death which results from wounds which could not have been self-inflicted sufficiently discloses a corpus delicti, (*People* v. *DuBois*, 16 Cal.App.2d 81 [60 P.2d 190]) this may be established in other ways. The autopsy surgeon expressed the opinion that the wound was not self-inflicted. From the record, including the exhibits, it seems improbable that the deceased could have inflicted such a wound under his left armpit while holding the knife in his right hand. It seems equally improbable that, with his left hand grasping matches and his right hand holding the knife, he could have fallen in such a manner as to drive this knife straight into his left side, without any angle. That he could then have withdrawn the knife presents a further improbability. There was evidence indicating that the appellant was not telling the truth, and that a considerable amount of cleaning up had been done. Without reviewing the entire evidence it must be held that the circumstantial evidence, with the reasonable inferences therefrom, was sufficient to establish a corpus delicti under the established rules, and that when viewed in connection with all of the evidence the corpus delicti was established beyond a reasonable doubt. Conceding that there might have been a possible doubt, the evidence was such as to justify the jury in believing beyond a reasonable doubt that the appellant inflicted the wound which resulted in the death of her husband. We have no doubt that the evidence is sufficient to support the verdict.

It is next contended that the court erred in refusing to admit evidence offered to show that at the time of the alleged offense the appellant did not have the mental capacity to form an intent to kill her husband. A doctor was asked "Do you believe that on March 7, 1950, she had the mental capacity to form an intent to kill her husband?" An objection was sustained. This doctor had first examined the appellant on April 3d, and there is nothing in the record

to indicate that he knew anything of her condition a month before. No offer of proof was made, and the evidence indicates that if a reply to the question had been permitted it would necessarily have been unfavorable to the appellant. The doctor testified that from his examination he believed that the appellant was telling the truth about this affair. If she was, her entire testimony strongly indicates that there was nothing the matter with her mental capacity at that time. The entire defense was that she had not killed her husband, and was in another room when he suffered the wound which caused his death. Under all of the circumstances, we find no reversible error in the ruling complained of (*People* v. *Rielly,* 101 Cal.App.2d 233 [225 P.2d 314]).

■ Prejudicial error is assigned in the court's refusal to give four instructions asked for by the appellant. The first of these, which was refused as covered, reads:

"You are instructed that when the case which has been made out by the People against a defendant rests entirely or chiefly on circumstantial evidence, and in any case before the jury may find a defendant guilty basing its finding solely on such evidence, each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt."

The court stated to the jury in its instructions that "This case is dependent nearly altogether on circumstantial evidence." It further instructed the jury in the identical language contained in the instructions in the first three paragraphs on page 675 of the opinion in *People* v. *Huizenga,* 34 Cal.2d 669 [213 P.2d 710]. The evidence here was sufficient to prove each fact in the chain of circumstances showing guilt beyond a reasonable doubt, and the instructions given sufficiently told the jury that each fact essential to the chain of circumstances showing guilt must be established beyond a reasonable doubt. Under the circumstances, no prejudicial error appears. (*People* v. *Huizenga,* 34 Cal.2d 669 [213 P.2d 710]; *People* v. *Webster,* 79 Cal.App.2d 321 [179 P.2d 633].) In the latter case, an instruction identical with the one here in question was also refused but was held to be sufficiently covered by the other instructions.

■ The second of these instructions, which was refused as covered, reads:

"You are instructed that in the case of certain crimes, it is necessary that in addition to the intended act which characterizes the offense, the act must be accompanied by a spe-

cific or particular intent without which such a crime may not be committed. Thus in the crime of murder or voluntary manslaughter a necessary element is the existence in the mind of the perpetrator of the specific intent to take the life of another and unless such intent so exists those crimes are not committed.''

It is argued that a specific intent is required in voluntary manslaughter; that this element was not covered in the instructions given by the court; that the court aggravated the prejudicial effect by referring to specific intention in connection with malice, in discussing the matter of intoxication; and that, in effect, the court left the jury with the impression that specific intent was no element of the offense of voluntary manslaughter.

The court instructed the jury as follows:

''In every criminal case there must be a joint operation of act and intent which means a deliberate and knowing intent to do the act. It doesn't imply knowledge that it is against the law because there is no excuse for ignorance of the law. It means there must be a knowing and deliberate intent to do what they do. Willful has substantially the same meaning. That means a consciousness of doing the act, doing it knowingly, doing it wilfully. It is of course, as I say, it doesn't imply an ignorance of the law. Intoxication in a case is no justification or excuse for the commission of crime. However, when a particular state of mind is a part of the crime it may be taken into consideration by you on that particular issue. As applied to this lawsuit, it would apply to the crime of murder of second degree. In the malice aforethought, whether or not there was malice in the case is one of the elements of the crime, and intoxication of the person committing the crime, if that exists, could be taken into consideration solely as bearing on that situation.''

And also,

''Manslaughter is the unlawful killing of a human being without malice. You see, right in there you get distinction with malice aforethought on one side and the other, without malice. It is the unlawful killing of a human being without malice. It is of three kinds, and as far as we are concerned in this case, it is two kinds because the third relates to the driving of an automobile.

''1. Voluntary manslaughter, which is that committed upon a sudden quarrel or heat of passion.

"2. Involuntary manslaughter, which is that done in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner.

"Going back to voluntary manslaughter upon a sudden quarrel or heat of passion, the term heat of passion means such heat of passion as would arouse the mind of the ordinarily reasonable, prudent, careful person. It doesn't mean that the defendant would say, 'I just got mad and did it.' You must consider all of the circumstances and if it was heat of passion, determine whether a reasonable man would be so swayed by those facts and circumstances, as would cause his passions to rise to the extent where he would act without malice but at the same time act in an unlawful manner which could and did result in death. The other definition is pretty well self explanatory."

The general instruction on intent referred also to a knowing and deliberate intent, and the limitation to the crime of murder of the second degree was applied only in connection with the matter of intoxication. Manslaughter of both kinds was defined and distinguished from the malice involved in murder, thus calling attention to the intent. In further defining voluntary manslaughter attention was called to the heat of passion which would cause a reasonable man to act without malice, but at the same time to act in an unlawful manner which could result in death. While the requested instruction could well have been given, we are unable to hold that refusal to give it constituted prejudicial error under the circumstances of this case. The appellant testified that she was not in the room at the time her husband received the fatal wound and that she had nothing to do with causing it. The instructions on manslaughter were more favorable to the appellant than otherwise, and were as favorable as was warranted by the evidence. It cannot be believed that the giving of this instruction could conceivably have changed the result, that the jury was in any way misled, or that it failed to understand what sort of intent was necessary. The matter was sufficiently covered under the circumstances, and no prejudicial error appears.

■ The third of these refused instructions was on excusable homicide as covered by section 195 and section 26, subdivision 6 of the Penal Code. This was followed by a direction to find the appellant not guilty if the jury found that the death of her husband resulted from accident and

misfortune brought about by the husband's use of force and that the appellant grabbed at a knife for the purpose of protecting herself, and without any unlawful intent or malice on her part the knife was plunged into the body of the husband, by either one or the other of the parties, which resulted in his death. It is argued that this instruction was necessary since several doctors testified to the effect that the wound which caused the death of the husband could have been either self-inflicted or the result of an accidental falling, and that no instruction on accidental death or excusable homicide was given. Not only did this instruction go beyond the scope of the evidence received, but the court in one of its instructions told the jury that the prosecution must establish that the death of the husband was the result of the act of some person, that it must further be proved beyond a reasonable doubt that there was some criminal agency which was the cause of death, and that ''proof of those things must necessarily exclude the theory of accident, accidental death or the theory of suicide or self inflicted death. If there is a reasonable doubt in your minds as to whether or not it was an accident or as to whether or not it was suicide, it would be your duty to resolve that in favor of the defendant and bring in a verdict of not guilty.'' Under the evidence received, this and the other instructions were sufficient and no reversible error appears in this connection.

The fourth refused instruction was to the effect that the law does not require a person to retreat before she may act lawfully in self-defense. The only argument made is that if any instruction on self-defense was applicable it was error to refuse this one. If any instruction on the law of self-defense was applicable, in view of the evidence, the matter was very fully, fairly and correctly covered in a long instruction given covering all elements of that subject.

It is next contended that the court erred in submitting to the jury only one form of verdict on the question of manslaughter, this being based on voluntary manslaughter. It is argued that an additional form of verdict covering involuntary manslaughter should also have been submitted since the indirect penalties from voluntary manslaughter might be greater than involuntary manslaughter. No objection was made, no request for such a form of verdict was made, and there is nothing in the evidence which required the submission of such an additional form.

In her closing brief the appellant raises for the first time the further point that the court erred in denying her motion for a new trial, since the remarks made by the court in passing upon the motion disclosed that he believed he was without authority to interfere with the jury's verdict. Not only was this point raised too late but it is completely without support in the record.

The judgment and order are affirmed.

Griffin, J., and Mussell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 19, 1951.