[Crim. No. 7572.   Second Dist., Div. Two.   Dec. 27, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT WILLIAM WETZEL, Defendant and Appellant.

Gladys Towles Root and Eugene V. McPherson for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and George W. Kell, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—After a jury trial, appellant Robert William Wetzel was found guilty of murder in the second degree in that he killed one Doris Louise McCarthy in violation of section 187 of the Penal Code. He appeals from the judgment of conviction and from the order denying his motion for a new trial. Appellant contends that the evidence is insufficient to sustain the judgment in that (1) the prosecution failed to prove the corpus delicti; and (2) that the incriminating evidence relied upon by the prosecution is not sufficient to prove appellant's guilt.

■ The corpus delicti of murder consists of the death of the alleged victim and the existence of some criminal agency as the cause of death. ■ Proof of the corpus delicti does not require identity of the perpetrator of the crime and it may be proved circumstantially or inferentially. (*People* v. *Cullen*, 37 Cal.2d 614, 624 [234 P.2d 1].) ■ "To prove a *prima facie* case of *corpus delicti*, all that was required was to show a reasonable probability that a criminal act of another had been the direct cause of the death. . . ." (*People* v. *Ives*, 17 Cal.2d 459, 464 [110 P.2d 408]; see *People* v. *Toth*, 182 Cal.App.2d 819, 824 [6 Cal.Rptr. 372]; *People* v. *Ogg*, 159 Cal.App.2d 38, 47 [323 P.2d 117]; *People* v. *King*, 132 Cal. App.2d 642, 647 [282 P.2d 923]; *People* v. *Black*, 103 Cal. App.2d 69, 75 [229 P.2d 61]; Fricke on California Criminal Law (7th ed.), p. 24.)

■ Viewed in the light of well established principles, the evidence in the case at bar is clearly sufficient not only to establish the corpus delicti, but also to support the jury's verdict.

George Mardell, called by the People, testified that he was employed as a room clerk at the La Tosca Hotel, 339 South Figueroa, Los Angeles, on the night of June 10th and 11th, 1960. At about 2 a. m. on June 11th he observed appellant enter the hotel accompanied by a woman. They had been drinking and appellant registered under the name of Mr. and Mrs. Robert Wifel, San Francisco. They were taken to room 312 where appellant asked the witness to close the window and pull down the shade. The clerk gave appellant the key to the room and he paid the rental for one night. This key was never returned. All that the witness could recall of the woman was that she wore a flowered dress and carried a pocketbook. Appellant wore a shirt and pants, and was without a coat. The pants were gray and the shirt "had some pink in it. He was kind of a mixture."

After appellant and the woman checked in, no one left the hotel until Mardell made his usual calls in the morning to arouse those tenants who had to go to work. He observed these people as they left, and, so far as he was able to observe, no one left room 312.

On examining People's exhibit 2, a photograph of the deceased, Mardell was unable to state whether the woman there depicted and the woman he saw with appellant on June 11 were one and the same. He believed the dress to be the same, and the body build to be the same. He identified a shirt

and a pair of slacks as being very similar to those worn by appellant when he entered the hotel. The witness further testified that the victim as depicted in People's exhibit 4 was positively "the lady that registered in with Mr. Wetzel."

The manager of the La Tosca Hotel, Fred Shannon, came on duty at about 6:30 a. m. on June 11th in relief of the clerk, George Mardell. At about 10 or 10:30 a. m. he saw appellant leave the hotel alone. Shannon asked him if he had the key and appellant replied: "No, I'm coming back. I'm in 312." About an hour and a half later appellant returned and asked Shannon when check-out time was. Informed that it was 12 o'clock, appellant said: "If I'm not down by 12 o'clock we're staying over." The manager noted that appellant had nothing with him when he left the hotel, but that on his return he carried a paper sack containing something that rattled, such as cans or bottles. He also noted that when appellant left the hotel, he had been sober, but when he returned he appeared to have been drinking. This was the last Shannon saw of appellant.

On June 12th Shannon reported for work at 6:20 a. m. He noticed that the key to room 312 had not been returned, and that the room rental had not been paid. He then conversed with Stephen Heutter, the houseman, gave him the passkey and told him to check room 312. This occurred between the hours of 10 and 11 a. m. After Heutter had been gone a few seconds, he called Shannon on the house phone, and asked him to come to room 312. Shannon met Heutter at the door, which he then opened, and observed the victim on the bed. Shannon called the police, who arrived in about 20 minutes.

Detective McCreadie, of the Los Angeles Police Department, testified that he arrived at the La Tosca Hotel at about 11:30 a. m. on Sunday, June 12. He met Mr. Shannon and they proceeded to room 312. The officer observed the following: A wastepaper basket at the foot of the bed containing two empty "Seven-Up" bottles, an empty wine bottle and an empty whiskey bottle; a silk stocking forming the pattern of a noose or stirrup that had been attached to the baseboard of the bed alongside the victim's left leg; the body of a woman outstretched on the bed, arms above the head with the slip and dress torn on the left shoulder; the lower portion of the body was completely exposed, there were blood smears on the clothing and there were numerous bruises on the arms; blood on the sheets near the face of the victim which looked as if it had come from "hand prints, like someone had wiped

their hands on the sheet''; hemorrhage from the nose and mouth of the victim, abrasions about 1½ inches long on the inner ankle of the left leg, a bruise on the upper and lower portion of the mouth, and several bruises on the legs; the nipple of the left breast had what appeared to be tooth marks with crusted blood around the nipple.

After completing his investigation at the La Tosca Hotel, Detective McCreadie went to room 352 of the Imperial Hotel which appellant had rented on June 6, 1960. Appellant was not there but the officer noted that the room had been recently occupied. The bed clothes had been disturbed, and there were cigarette ashes in the room but no clothing nor personal effects were found.

Doctor Mills, a Los Angeles County Deputy Coroner, examined the body of the victim on June 13, 1960. The doctor expressed the opinion that the victim had died by strangulation. He stated that the injury to the left breast probably had occurred following death. Among numerous other injuries, he found that there was a large tear or laceration in the vagina. Internally and not observable from the surface he found hemorrhages and bruising in the areas of the lymph portion of the neck and at the base of both sides of the neck. There were hemorrhages around the lobe of the thyroid gland, adjacent to the laryngeal structures and in the ligaments between several of the cartilages of the Adam's apple. There was also a hemorrhage across the base of the tongue.

Based upon the decrease in normal body temperature from the time of death to the time the victim was discovered, the doctor concluded that she probably died sometime between midnight and 7 a.m. on June 12, 1960.

His testimony also indicated that the victim was an alcoholic and that she was intoxicated at the time of her death with a blood alcohol content of .27 per cent. Appellant's counsel, on cross-examination of the doctor, raised the possibility that the victim might have died of asphyxia resulting from an alcoholic condition or from pressures exerted in the course of love making. The doctor testified that it is possible for a person to die of asphyxia caused by an alcoholic condition and ''that alcoholics are more susceptible to asphyxial deaths from some type of neck injury, particularly those injuries over the carotid body in which there would be a reflex death or stoppage of the heart. This is not asphyxial death, but is a death due to injury in the neck in an alcoholic.'' The doctor reiterated his opinion that the death in this case was

caused by strangulation of which asphyxia was the end result.

Appellant took the stand in his own behalf, and testified that he had come to Los Angeles in February of 1960 and had registered at the Imperial Hotel about a week prior to June 10, 1960. He had no baggage, but had intended to get an apartment in town.. He was working at the time at the California Hospital as a painter, and stated that he met the victim in a Main Street bar on Friday, June 10, 1960. They had a few drinks together, stopped at a number of bars and both became intoxicated. Appellant testified that during the evening they met a man by the name of Kennedy at one of the bars and that the three of them went to a liquor store where they purchased some whiskey. They then proceeded to Mr. Kennedy's apartment and had a few drinks while the victim shampooed her hair. Appellant said that he left Kennedy's apartment shortly thereafter. He said that the next thing he remembered was awakening Saturday morning on the street. He testified that he arose, went across the street and had more to drink. He stated that he arrived at the Imperial Hotel about 3 or 4 p. m. on Saturday, slept there that night and awoke about 11 o'clock on Sunday morning. He had some breakfast and went to a movie in the afternoon, then had more to drink and returned to his hotel. He stated that he returned before midnight, but was indefinite as to the exact hour. He denied ownership of the clothing introduced into evidence by the People, although laundry slips were discovered on his person at the time of his arrest which, upon investigation, proved to be receipts for the deposit of these very clothes in a laundry. Appellant attempted to explain this circumstance by stating that the slips had been given to him by a man named White in order for him to pick up this man's laundry.

Appellant testified that he had no recollection that he had ever been in room 312 of the La Tosca Hotel or that he had ever signed the register at that hotel. The last time he remembered having seen the victim was Saturday morning at Mr. Kennedy's apartment.

He had checked into room 352 of the Imperial Hotel on June 6, 1960. He went to work on Monday, June 13, but failed to go to work on the following Tuesday, Wednesday and Thursday. He was arrested on Thursday morning when he was at the hospital waiting for his paycheck. He failed to tell the officers who arrested him about the man named Kennedy, or his visit to this person's apartment. He also denied

prior knowledge of a newspaper clipping which was found on his person at the time of his arrest and which related to a case of killing by strangulation in which the judge was quoted as saying that the killer's term was too light. He admitted a prior conviction of assault and battery with intent to ravish in Pennsylvania on March 10, 1947.

Officer Smith of the Los Angeles Police Department was staked out in appellant's room at the Imperial Hotel beginning at 6 p. m. on Sunday, June 12th. He remained there until 12:30 a. m. Monday. During that time nobody entered the room other than police officers. Officer Greeley of the Los Angeles Police Department, the arresting officer, stated that he found a bus schedule in the appellant's shirt pocket at the time of arrest, and the aforementioned laundry slips. He also removed from the appellant's person a paper bearing the name of the victim. The police removed a water glass from underneath the bed in room 312 of the La Tosca Hotel and lifted therefrom a latent fingerprint identified as that of appellant. Another fingerprint of the appellant was found on the upper edge of the sink. Cloth marks were found on the victim's purse, a wine bottle, whiskey bottle, "Seven-Up" bottle, and a glass door knob. These marks indicated that someone had handled those objects with a cloth fabric. There was testimony that such cloth marks are usually the result of someone's attempting to erase fingerprints or of one's wearing cloth gloves.

The evidence as above summarized is clearly sufficient to sustain the judgment of conviction. ■ "The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact. It is not whether guilt is established beyond a reasonable doubt. [Citations.] ■ The rule is stated in *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778] '. . . "We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict." ■ If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury. (*People* v. *Perkins,* 8 Cal.2d 502 [66 P.2d 631] ; . . .) In the *Perkins* case this court expressly rejected the application of the statement from the *Staples* case to a situation which involved only circumstantial evidence. ■ As pointed

out by the court the rule that the circumstances relied upon by the prosecution must be consistent with guilt and inconsistent with an hypothesis of innocence is a rule of instruction for the jury, and is not the rule for the guidance of the court on review.' '' (*People* v. *Daugherty,* 40 Cal.2d 876, 885-886 [256 P.2d 911].)

The presence of the appellant at the scene of the crime was established by his handwriting on the register, his fingerprints in the room itself, and his positive identification both by the clerk and by the manager of the hotel. Appellant failed to account for the early morning hours of Saturday, June 11, when, as demonstrated by the evidence, he registered at the La Tosca Hotel with the victim. Although he testified that he had no recollection of going to the La Tosca Hotel or of registering there, the jury was more than justified in finding this testimony to be false. From all the evidence the jury was entitled to infer that appellant continued in residence at the La Tosca Hotel at all material times. On two separate occasions police officers checked his room at the Imperial Hotel and failed to find appellant. The jury was also entitled to infer that appellant retained possession of the key to room 312 of the La Tosca Hotel and that he alone had access thereto during the crucial time intervals.

Appellant's motive for the crime could be inferred from his prior conviction for assault and battery with intent to ravish. A morbid interest in strangulation killings could have been inferred from the newspaper clipping found on his person at the time of his arrest. Since no cries for help nor any other loud noises were heard by the tenants of the hotel in rooms next to the murder room it is reasonable to infer that the victim was killed by someone she knew.

The judgment and the order denying the motion for a new trial are affirmed.

Fox, P. J., and Ashburn, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 21, 1962.