[Crim. No. 3350. Second Appellate District, Division Two.—October 15, 1940.]

THE PEOPLE, Respondent, v. LAUREL HARVEY CRAWFORD, Appellant.

William W. Larsen for Appellant.

Earl Warren, Attorney-General, and John L. Nourse, Deputy Attorney-General, for Respondent.

MOORE, P. J.—Defendant appeals from the judgment after verdict by a jury, on four counts of murder. After denial of his motion for a new trial, he was sentenced to life imprisonment on each count, the sentences to run consecutively. He takes this appeal from the order denying

him a new trial as well as from the judgment. If the findings of the jury are not supported, defendant was the unfortunate victim of a most extraordinary accident but if they were founded upon a rational consideration of substantial evidence, defendant is guilty of a most heinous crime,—the murder of the wife who loved him, of his own three children of tender years and of a confiding friend.

The contentions of defendant are as follows: (1) that the evidence is insufficient to support the verdict and the judgment; (2) that the trial court erred in admitting testimony concerning the result of certain experiments conducted by the prosecution witnesses; (3) that the trial court erred in failing to instruct the jury upon its own motion that defendant might be convicted of the lesser offense of manslaughter.

In the early evening of December 11, 1939, defendant invited his friend Ralph Barnett to join him and his wife and three children for a ride up Angelus Crest Highway, the road leading to Mount Wilson, to a point where they might look over the lights of the cities below. Defendant drove his 1937 Chevrolet sedan. Upon the return down the mountain about 7:30 p. m. of the same day, the car left the road and came to rest about 1000 feet below. Defendant remained upon the edge of the highway but all the other occupants of his car were found dead in the chasm below. The body of Mrs. Crawford was discovered at a point 350 feet below the road, and the bodies of the two daughters, Alice and Helen, aged 16 and 8 respectively, were about 50 feet below the body of their mother; the body of Barnett lay 200 feet below the bodies of the girls while the corpse of the little son Paul, aged 10 years, lay 100 feet below that of Barnett. Just what the defendant did during the night after his car went over the embankment must be left to inference for no eye beheld him. However, on the following morning, two members of the county road crew came upon defendant beside the Mt. Wilson road. He told the crew members that his car had gone off the grade at 7:30 o'clock the previous evening and that all of his family had been killed in the wreck. He stated that he had lost control of his car about three miles above the point where it went over the embankment because the brakes were not functioning and because of other mechanical defects.

But, he stated that just before his car plummeted from the highway, he had almost acquired control of the car when his wife seized the steering wheel and caused the car to be precipitated into the abysmal gorge. As he saw it leaving the embankment, he "jumped . . . and slid out of the car" and landed on the bank. He suffered no injury. The car was in a reasonably good mechanical condition prior to the tragedy. Moreover, it was established that a motor car of approximately the same size and weight as the defendant's sedan, by starting down the mountain grade at the same point where the Chevrolet began its flight, according to defendant's story, would have come to a full stop without the use of brakes less than one mile above the point where the Chevrolet went over the embankment.

The autopsy revealed that the cause of the death of Helen was a circular depressed fracture of the skull and concussion of the brain with accompanying hemorrhage. Death came to both Alice and Paul from identically the same sort of blow, each suffering a crescent shaped wound above the left eye causing a concussion and hemorrhage. Mrs. Crawford received a crescent shaped laceration in the center of her forehead and concussion and hemorrhage which caused her death. Barnett received three crescent shaped wounds upon his forehead and another on his nose and he died of concussion and hemorrhage. The crescent shaped wounds received by these victims were of such striking similarity and of such a character that a reasonable person might conclude that they could have been caused by blows from the large flat end of a hammer of the type which constitutes a part of the standard equipment of the 1937 Chevrolet sedan.

Before proceeding further to consider severally the strands that have been woven into a web that now enmeshes the defendant, we pause to contemplate the motive that has been ascribed for so diabolical a deed. Its very sordidness almost compels its rejection. During 1938 and 1939 defendant obtained a number of life insurance and accident policies upon his wife and children. Because of the double indemnity feature of most of the policies, in case of death by accident to the insured, defendant, as beneficiary, would receive a total of $30,500. The policies upon his children were the maximum amounts allowable by the insurance company on their lives. He had applied for a $20,000 accident policy on the life of his wife but obtained an accident policy for

only $5,000, the maximum amount to be allowed by the company. In 1938 he had rejected a policy in the amount of $8,000 upon the life of his wife because the company refused to grant double indemnity for accidental death. In 1939 he obtained an additional policy upon her life in the sum of $2,000 with the double indemnity feature. He declared from the witness stand that he was an "ardent believer in insurance". While he was thus ardently engrossed in obtaining insurance contracts on the members of his family, his wife was assisting in their support by performing domestic service for others. He testified also that in 1938 he computed the amount of money he would receive if his family were to be accidentally killed and also estimated the amount of monthly income he would receive if such insurance money were invested in annuities. In November, 1939, he discussed the plan of entering into the automobile business with two men and stated to them that he expected to have about $30,000 available for the investment. On December 8, just three days before his family were sent to their doom, he signed a contract for the purchase of a new automobile and advised the salesmen that he would have cash available in the amount of the purchase price in less than 90 days.

It is obvious that the evidence was necessarily of a circumstantial nature for the defendant was the sole survivor; there were no eye-witnesses. His explanation of the events was irrational. In addition to many inconsistencies in his testimony, there was much evidence that indicates that his version of the tragedy was wholly and patently false. He was driving a modern automobile with synchronized mesh transmission and hydraulic brakes. The car had been driven approximately 27,000 miles and was in good mechanical condition a few days before the fatal ride. Defendant stated to the officers that his brakes were of absolutely no use to him in his endeavor to bring the car under control. But he had made all boulevard stops while going 35 miles per hour after leaving his home and the proof is that at a distance 40 feet from the precise point where his car left the road, there were skid marks made by automobile tires which demonstrated that not only were his brakes in good mechanical order but that he applied them and they held. He testified that by reason of defective brakes and carbureter, his car was out of control for a distance of almost three miles before

the crash. But he must have remembered that he had driven up the same road in high gear. Prosecution witnesses, using cars of approximately the weight and size of the Chevrolet sedan had caused their cars to roll down the grade in neutral without applying any brake from a point 2.9 miles above the place where the car rolled off into the canyon. In both instances the cars came to a stop of their own accord on an up-grade at a point less than a mile above the scene of the wreck. Defendant testified that because the carburetor of his Chevrolet was out of adjustment, his car obtained a speed of 50 miles an hour before he could shift into second gear. But if his brakes were in good condition, his attempt to charge his failure to stop to his inability to use compression is as incomprehensible as his failure to let the car coast in neutral, which, at least, might have allowed the car to stop on said up-grade. Moreover, with all of his explaining, he gave no rational explanation of his wildly coasting down the left side of a mountain grade,—the side where danger lay.

Defendant's story that he was able to escape from a car traveling 50 miles an hour as it went over the embankment without receiving a serious scratch or bruise and without damage to his clothing or to his spectacles imposes a severe strain upon one's credulity.

A further evidence of defendant's irresponsibility in his utterances and in his testimony concerns his youngest daughter. He claimed that she was alive when he found her but that she died before 12:30 a. m., five hours after the car leaped from the mountain grade. But the embalmer who examined the child's body at 8:30 a. m. (the morning after the wreck) testified that at that time her corpse was still warm and that lying on the mountain side on a cold night would not have retained any warmth more than three hours. A period of twelve hours elapsed from the time of the wreck to the time defendant reported the tragedy to the two men of the road crew; yet in that period at least four automobiles had passed the scene of the crime, within which time the defendant walked almost three miles up the mountain road where help was available and then retraced his steps to a point about a mile and a half below the wreck in order to get a drink of water. But at no time during those twelve hours did he make any attempt to obtain help. Pressed for an explanation as to his failure to report the events of the

night, defendant merely stated that "it was no use . . . they were all dead any way". Further evidence of his effort to conceal the truth is found in the proof that at the time of his first encountering the members of the road crew, he had a flash light in his hip pocket. He maintained at first that he had found the flash light after daylight as he came up the mountain side. Later he stated that he had found it near the body of his boy. But on other occasions he maintained that it was "near the road" and at another time his explanation was that the flash light must have been thrown from the car and was uninjured because it had been wrapped in a turkish towel.

At first he related to the road crew that the blanket and coat of one of the children which he carried around his shoulders were found by him about four hours after the wreck; but in court he testified that he had found them after daylight.

His statements with respect to the insurance were conflicting. He first stated that he had no insurance on any member of his family. Subsequently, however, he stated he did have just enough insurance on them to cover the cost of burial. But, upon further questioning, he acknowledged the actual amount of the insurance.

 It is thus disclosed that many of defendant's extrajudicial statements as well as those made before the jury were proved to be false and that his version of the tragedy was a fabrication of a perverted mind. Not only do his statements disclose wilful falsehoods in his narrative concerning each incident in the grewsome affair but the very wounds upon the heads of his victims were a circumstance which, in connection with the other evidence, might readily and justifiably have led the jury to believe that in order to accomplish a cold-blooded murder of his wife and innocent children, he was to descend so low as to beat the last vestige of life from them with the flat edge of a hammer.

These are such circumstances as warranted the jury in arriving at the conclusion that the defendant had committed wilful, deliberate, premeditated murder of his own offspring and their mother. (*People* v. *Durborrow,* 130 Cal. App. 615 [20 Pac. (2d) 708] ; *People* v. *Perkins,* 8 Cal. (2d) 502 [66 Pac. (2d) 631].) In the Perkins case the court emphasized the principle that it is not the function of the appellate court to determine the weight of the evidence. Its

duty is confined to a determination of whether or not upon the evidence presented sufficient facts *could not have been found by the jury* to warrant the inference of guilt. █ Express evidence of a deliberate purpose is not required to establish a criminal motive. It is sufficient if the facts and circumstances are such as to warrant a reasonable inference of such purpose. (*People* v. *Dale,* 7 Cal. (2d) 156 [59 Pac. (2d) 1014].) █ Indeed, the commission of the crime itself may be established entirely by circumstantial evidence. (*People* v. *Green,* 13 Cal. (2d) 37 [87 Pac. (2d) 821].)

Defendant here contends that when all the facts and circumstances of the case are considered, the inference arising therefrom is just as consistent with his innocence as it is with his guilt. █ But the mere fact that the evidence is susceptible of two inferences, one of innocence and one of guilt would not warrant a reversal of conviction. (*People* v. *Green, supra.*) █ As pointed out by the court in the Perkins case, *supra,* and subsequently approved in the case of *People* v. *Newland,* 15 Cal. (2d) 678 [104 Pac. (2d) 778], the rule that the circumstances proved by the prosecution must be consistent with guilt and inconsistent with any hypothesis of innocence is a rule for the guidance of the jury and not for a court of appeal. █ The appellate court is bound by the findings of the jury where it rejects the hypothesis of innocence if there is substantial evidence to support the finding of guilt as the more reasonable of the two hypotheses. Under this rule, the conviction of the defendant herein is amply supported by the evidence.

█ Defendant contends that in admitting testimony concerning the result of certain experiments, the court committed prejudicial error. The testimony referred to is that of witnesses who by using automobiles similar in size and weight to that of the Chevrolet of defendant, found that when permitting their cars to descend the mountain grade out of control from the point where defendant's flight began, they would come to a stop without the application of brakes at a point less than one mile from the spot where the Chevrolet plunged over the embankment. The point urged by defendant that the cars used by the officers to perform the experiment were of different makes, models and weights from those of the Chevrolet was carefully considered before the evidence was submitted. The court first required that it be shown that the experiments by the officers were conducted with cars of approximately

the same weight as the Chevrolet and under conditions substantially the same as those which existed on the evening of December 11th. This foundation having been laid, the court properly admitted the testimony of the officers. (*People* v. *Ely*, 203 Cal. 628 [265 Pac. 818]; *People* v. *Dyer*, 11 Cal. (2d) 317 [79 Pac. (2d) 1071].) It is the rule that whether such testimony will be received or rejected lies within the sound discretion of the trial court so long as substantially the same conditions obtain in the experiment as existed in the original act. Where the evidence tends to aid rather than to confuse the jury, there is no abuse of discretion in admitting such testimony. (*People* v. *Glab*, 15 Cal. App. (2d) 120 [59 Pac. (2d) 195].)

 Finally, defendant contends that the court committed prejudicial error by its failure to instruct the jury with reference to manslaughter. While defendant neglected to request an instruction defining manslaughter, it has not prejudiced him on this appeal. By his request for another instruction, he eliminated this issue. He asked the court to advise the jury that if they entertained a reasonable doubt as to whether the killing was deliberate and premeditated, they must find defendant not guilty. This instruction utterly removed from the jury's consideration any question of a crime less than that of murder.

The judgment and the order denying the motion for a new trial are, and each of them is, affirmed.

Wood, J., and McComb, J., concurred.