[Crim. No. 5972.   Second Dist., Div. Two.   Mar. 31, 1958.]

THE PEOPLE, Respondent, v. FRANCIS MARION OGG, Appellant.

Morris Lavine and William J. Clark for Appellant.

Edmund G. Brown, Attorney General, and Dan Kaufmann, Deputy Attorney General, for Respondent.

FOX, P. J.—Defendant was convicted of murdering his wife on Christmas Day, 1956. The jury fixed the offense as murder in the second degree. The jury found the charge that defendant had suffered a prior felony conviction for forgery to be true. Defendant's motion for a new trial was denied and he was sentenced to the state prison. He has appealed from the judgment of conviction.

In seeking a reversal defendant contends (1) that the corpus delicti was not sufficiently established to warrant the introduction of his extrajudicial statements; (2) that the evidence is insufficient to support the conviction of second degree murder; and (3) that the court erred in failing to give an instruction on excusable homicide as defined in section 195 of the Penal Code. In view of defendant's first and second contentions, it is necessary to set forth the evidence in considerable detail.

Defendant's wife died as the result of a fractured skull with intracranial hemorrhage and cerebral lacerations. She was found dead in her home in West Covina by her daughter on December 27, 1956, at approximately 9 p. m. Her body was lying on a bed in a spare bedroom, covered by a comforter. There was blood on the davenport in the living room, on a pillow, and on a towel on the davenport. Her Lincoln car was missing from the garage; the mechanism of a lady's wrist watch was on a coffee table, and on her left arm was the band and empty case. A note was found in the

handwriting of defendant on the kitchen drainboard; it was written on the back of Christmas wrapping paper and read: ''I can't wake Betty up and I'm frightened. I swear I didn't hit her or hurt her. Francis.''

The deceased was 46 years old, 5 feet 4 inches in height, and weighed 101 pounds. An autopsy was performed on the body by Dr. Newbarr of the coroner's office. He found multiple superficial abrasions on the left forehead, above and lateral to the right eye and on the left side of the face. There was a reddish purple discoloration with swelling of the soft tissues around the right eye, and a very small abrasion over the bridge of the nose. Also, there were abrasions in the skin over both elbows, the right forearm, and on the anterior surfaces of both legs. The entire right side of the underscalp was discolored, as well as the left frontal area. There was hemorrhage in the right temporal muscle, and the left temporal muscle revealed damage. Two subdural hematoma were found, one extending over the left side of the head and measuring one inch in its thickest portion, the other on the right side being thin and localized. There was widespread damage extending throughout the left side of the brain, and small localized contusions in the right side and in the left rear portion. There was hemorrhage toward the base of the brain. There was a fracture 9 inches in length commencing one and a half inches above the right ear; it descended into the base of the skull toward the front of the head, crossing the midline into the left side.

Dr. Newbarr found the discoloration to the right eye difficult to evaluate. It was his opinion that this condition could have been the result of the application of some external force, or the result of the fracture because of its nearness to the right anterior fossa at the base of the skull. The fracture could have been the result of a blow to the head with a hard, blunt object, or the result of the head projected against a hard object. In the doctor's opinion there was no connection between the external injuries on the left side of the head and those on the right. Also, it was his opinion that the fracture was caused by one injury and that there was no connection between the fracture and the injuries to the left side of the forehead. If the fracture was caused by a fall it must have been a dead weight fall, full length on a hard surface The doctor did not feel that the fracture could have resulted if the deceased had merely collapsed, folded up and fallen. Considerable force was necessary to cause the fracture.

Deceased's daughter came to her home on Christmas day. At that time, with the exception of an abrasion below her right knee, the deceased had no other marks on her body. The deceased complained that defendant had not come home until 12 o'clock on the night before, and that when he came home on Christmas eve he had been drinking and had hit her and knocked her down. She told her daughter that she had sustained the abrasion that night. The daughter further testified that they all visited friends of her mother and defendant; that she stayed there until 1 o'clock in the afternoon and then left, taking her younger brother with her. This was the last time she saw her mother alive.

Some time between 4 and 4:45 on Christmas day defendant and decedent drove to the home of Clyde Faust in West Covina. Defendant went in but decedent drove off. In the meantime Faust, defendant and one Orville Cook had some drinks in the breakfast room. Defendant told them that he and his wife had been at Bill Bird's for several hours and had had a good time. A few minutes later the deceased walked in. She appeared to have been drinking quite a little. She called defendant a vulgar name and berated him. Cook persuaded her to sit down, and mixed a drink for her. Defendant's attempt to placate her resulted in her quieting down for a few minutes; however, she again began to berate him; among other things she said: "I'm going to tell your probation officer on you. You've been writing some of my checks again." At this point, Cook left to replenish the liquor supply; upon his return he mixed another round of drinks; before they were consumed the deceased threw a glass ash tray at defendant, which broke when he dodged it. Faust thereupon told defendant and his wife that they couldn't fight in his home. Defendant complained to his wife that she was ruining him with his friends, and suggested that she go home. She countered, "Why don't you go home with me?" He replied, "I am going to stay here with my friends." She then said, "Well, I wasn't asked to go home." Thereupon Faust asked her to leave. Cook testified that at this point defendant picked the decedent up in his arms and carried her out. Faust's version of this incident was that defendant put his hands on decedent's shoulders, turned her around and started her toward the living room door, where they disappeared from his view.

The living room adjoins the kitchen; it was 30 feet from the kitchen to the front door; the living room was carpeted, except the entry hall, which contained a cement floor referred

to as a slump stone. After defendant and his wife left, Faust and Cook heard a scuffing noise, a dragging of feet, like rubbing one's feet on a rug. Then they heard the front door close. Cook went to latch the front door at Faust's request and discovered fresh blood spots on the slump stone of the entrance hall. Two of these spots were about the size of a baseball; there were one or two other smaller spots; all of these were within two or three feet of the door.

Defendant returned to the Faust home approximately an hour later, around 6:45 p. m. He came into the kitchen where Cook was and said, "I'm afraid I killed her this time, Cookie." Cook said, "Francis, you're kidding." Defendant replied, "Well, if she wakes up—if she comes up with a couple of black eyes tomorrow, just remember she fell and hurt herself." Faust testified that he showed defendant the blood in the entry hall, and defendant said, "I didn't hit her, Mama took an awful fall."

Defendant and Cook then left in the latter's car and drove to defendant's home, the defendant stating he wanted to see "if Mommie got to bed all right." Defendant invited Cook to see a new sport jacket which the deceased gave him for Christmas. They went into the bedroom and Cook observed the deceased lying in the bed on her side with a comforter covering her to her neck. She appeared to have dried blood on her right nostril, but he did not observe any other mark. She looked natural but there was no movement; he was some 10 or 12 feet from her. After the exhibition of the sport coat, defendant patted the deceased on the cheek, saying, "I love you, baby," and the men left. They had not been there more than five minutes. They proceeded to a friend's house for a drink and then to a bowling alley. While enroute defendant said to Cook: "I'm afraid I hurt her this time," and Cook replied, "Francis, you better quit that. . . ." At the bowling alley Cook noticed blood on the front of defendant's trousers. Defendant told him "that came from Mama's nose." Defendant and Cook returned to the Faust home a little after 10 o'clock. At that time Faust gave defendant his wife's shoes which had fallen off her feet. Cook and defendant left there between 10:30 and 11. Defendant's home was only a few blocks from the Faust home.

At 7:30 a. m. on December 26th defendant cashed a check for $50 at a West Covina gas station. The check was payable to cash and purported to be signed by Edna C. Rosedale, Rosedale being the deceased's previous married name. The

check, however, was in defendant's handwriting. The defendant was driving a Lincoln automobile. He told the attendant that his mother or mother-in-law was either sick or had passed away.

Harold J. Tucker testified that he was at the home of a neighbor of defendant and decedent by the name of Hamm in the early part of November, 1956, about 8 o'clock in the evening, when decedent ran through the house saying "he's after me." Later he heard a "hitting" sound in the back yard, looked out the window, and saw the deceased on the ground and the defendant holding her arm. That about an hour later the deceased knocked on the front door, and when Tucker let her in she ran to the bathroom and locked herself in. In a few minutes the defendant appeared and told Tucker to let his wife come out. When he let defendant in, defendant threatened him and told his wife to come out, but she refused. She did not leave there until defendant had gone and the absent neighbor who lived in the house had returned. On the second occasion when she entered the house she had a scratch and a couple of bruises on her face.

Defendant was arrested in Las Vegas on December 29, 1956. He gave a recorded statement to a representative of the Los Angeles County sheriff in which he stated that he was 37 years old and had been married to the deceased for approximately eight months; that they lived in West Covina; that one of decedent's three children by a former marriage, a boy 7 years of age, was living with them. Defendant told of the visit on Christmas morning of the deceased's daughter, and their later visit that morning to the Bird home, where they had stayed until around 5 o'clock. The daughter had previously left with the boy. Enroute to their home, defendant and his wife stopped at the Faust home, which defendant entered while his wife drove away. However, she returned to the Faust home in a few minutes. She kept arguing and finally threw an ash tray at defendant, which angered Faust. Because of this, defendant suggested that they had better go home. He said the living room was dark, and when they went out the deceased, who was staggering drunk, tripped on the carpet; he thought she hit the wall; then he heard her hit the concrete patio. He said she was unconscious after the fall and was bleeding from the nose. He got her home and put her to bed and then went back to the Faust home to get Cook because he thought she was hurt "real bad." He brought Cook back to his house and asked him to look at her. Cook

went into the bedroom and commented to defendant, "She'll be all right." According to defendant, she was then sleeping. He further stated: "I put a towel under her head because her nose was bleeding; I couldn't seem to stop it, so Cookie and I went bowling." After bowling, defendant stated that he came home about 2 a. m. and found she was bleeding pretty badly. He then stated that he gave her a cold shower thinking this would wake her up, but it did not; so after that he put her back in bed. He claimed that she was breathing all right and even snoring. Defendant went to bed on the Chesterfield and woke up about 4 a. m. After he awoke he got up and glanced in the bedroom at her but did not hear anything. He thought she had a concussion; he was "scared"; at first he said he did not know whether she was dead but later he admitted that he had a pretty good idea that she was. He also admitted leaving the note, previously referred to, on the kitchen sink.

He left the house around 6:30 or 7 o'clock that morning. He not only took the deceased's Lincoln car but also her diamond ring from her jewel case. He admitted in this statement writing a check for $50 and signing her name to it. He cashed it at the service station, where he told the attendant that he was going to see his mother, and then drove to Las Vegas where he registered under the name of Michael Doland; he did this because he did not want anyone to know where he was for awhile. He gambled, playing poker and roulette. He got $200 additional money by pledging his wife's diamond ring. He also stated he forged another check in her name. Defendant admitted in this statement that he had beaten his wife twice before, and that on one occasion she went to inquire about a divorce, moved out of the house, and lived with her sister for a week over the Thanksgiving period, but that they became reconciled after that. He further admitted that on one other occasion he had slapped her, but denied that he had ever hit her with his fist.

As a witness in his own behalf, defendant denied using any force on the deceased on the occasion in question. He testified, among other things, that she fell in the entrance hall; that he heard her hit the floor, and when he came up to her she was lying diagonally across the entrance. He knew she was unconscious when he went to lift her; when about a foot from the floor she slipped out of his hands and fell on her face. Defendant admitted that he saw blood after his wife slipped out of his hands; that he felt she was seriously hurt, and that he did not tell either Faust or Cook about it, or ask either of

them to phone the police or call an ambulance. He admitted that he wrote a check for $50 from his wife's checkbook; that he took her ring from a jewel box on the dresser; that just before he left the house he wrote the note found on the kitchen drainboard; that he then took off for Las Vegas in his wife's Lincoln car, arriving there around 2 o'clock in the afternoon; that he registered under a false name; that he lost all his money gambling, and pawned his wife's ring the following day.

He further testified that they had been married about eight months, during which time his wife had complained against him to the police about three times; that she left their home for a week in November and went to live at her sister's house. At that time he promised that he would never hit her again if she came back. He admitted the incident of his wife's locking herself in the bathroom at the home of Mr. and Mrs. Hamm. He also admitted that he had suffered a prior felony conviction.

Defendant testified that he had been a boxer and had engaged in some 60 bouts, fighting at various weights from 160 to 172 pounds.

WAS THE CORPUS DELICTI SUFFICIENTLY ESTABLISHED TO WARRANT THE INTRODUCTION OF EXTRAJUDICIAL STATEMENTS OF DEFENDANT?

█ "In a murder charge the corpus delicti consists of two elements: the death of the alleged victim and the existence of some criminal agency as the cause, either or both of which may be proved circumstantially or inferentially. [Citation.] █ However, the corpus delicti must be proved by evidence independent of the extrajudicial declarations and statements of the defendant. . . . █ But as prerequisite to the reception of such statements in evidence, the corpus delicti need not be established by proof as clear and convincing as is necessary to establish the fact of guilt; rather it is sufficient that only a prima facie showing be made that the alleged victim met death by a criminal agency. [Citation.]" (*People* v. *Amaya,* 40 Cal.2d 70, 75-76 [251 P.2d 324].) █ "To prove a prima facie case of *corpus delicti,* all that was required was to show a reasonable probability that a criminal act of another had been the direct cause of death. . . ." (*People* v. *Ives,* 17 Cal.2d 459, 464 [110 P.2d 408]; *People* v. *King,* 132 Cal.App. 2d 642, 647 [282 P.2d 923]; *People* v. *Black,* 103 Cal.App.2d 69, 75 [229 P.2d 61].)

■ The nature, location and extent of the injury that caused death; the fact that considerable force was necessary to cause such an injury and that it would not have been caused by an ordinary fall; the presence of abrasions, bruises and other injuries on various parts of decedent's body which were disconnected with the injury causing death; the failure of defendant to inform his friends or seek aid at the time of his wife's asserted fall at the Faust home, even though he knew she was seriously injured and unconscious and the defendant's flight: these facts establish a reasonable probability that decedent met her death by means of a criminal agency. Thus, a prima facie showing of the corpus delicti was made, and defendant's extrajudicial statements were properly received in evidence.[1]

## The Sufficiency of the Evidence

■ Before the verdict of a jury which has been approved by the trial court can be set aside on the ground of the insufficiency of the evidence it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. ■ We must assume in support of the judgment the existence of every fact which the jury could reasonably deduce from the evidence. ■ If the circumstances reasonably justify the verdict, the opinion of the reviewing court that those circumstances might also be reconciled with the innocence of the defendant will not warrant a reversal. (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778] ; *People* v. *Frankfort*, 114 Cal.App.2d 680, 689 [251 P.2d 401].)

■ Applying these principles, it is clear that there is ample evidence to sustain the verdict and judgment. In addition to the evidence mentioned above touching upon the question of the corpus delicti, the jury had before it the fact of defendant's use of a false name following his flight to Las Vegas, his incriminating statements to Cook and the representative of the sheriff's office in Las Vegas, the decedent's threat to turn him over to his probation officer for writing checks on her account, and his past conduct in striking her. Other circumstances need not be enumerated for these adequately support the verdict that defendant was criminally responsible for his wife's death.

---

[1]No objection was made at the trial to the admission in evidence of the tape recording of defendant's statements to the officer in Las Vegas.

*People* v. *Burns*, 109 Cal.App.2d 524 [241 P.2d 308, 242 P.2d 9], is, in many of its aspects, similar to the case at bar. There, as here, the defendant claimed the death of his female companion was the result of falls. There was no eye-witness. Her physical condition, however, indicated that she had received a beating. Although the conviction was reversed on other grounds, the court determined that there was sufficient evidence to sustain a verdict of second degree murder. In rejecting defendant's explanation as to the cause of death, the court stated (p. 534) : ''Assuming that the evidence is also susceptible of the inference that her death might have been due to falls, that does not justify us in reversing the verdict. '. . . the mere fact that the evidence is susceptible of two inferences, one of innocence and one of guilt would not warrant a reversal of conviction. . . . The appellate court is bound by the findings of the jury where it rejects the hypothesis of innocence if there is substantial evidence to support the finding of guilt as the more reasonable of the two hypotheses. Under this rule, the conviction of the defendant herein is amply supported by the evidence.' (*People* v. *Crawford*, 41 Cal.App.2d 198, 205 [106 P.2d 219].)''

In this connection defendant argues in effect that the evidence in this case is as consistent with the theory that the deceased's injuries were caused by a fall as it is with the theory that she was the victim of foul play. ▓ But the rule that the circumstances must be consistent with guilt and inconsistent with any hypothesis of innocence is a rule of instruction for the jury,[2] and is not the rule for the guidance of the court on review. (*People* v. *Cullen*, 37 Cal.2d 614, 625 [234 P.2d 1]; *People* v. *Newland, supra*, p. 682; *People* v. *Perkins*, 8 Cal.2d 502, 511 [66 P.2d 631].)

▓ Defendant contends that the People's entire case falls because the evidence fails to show any injury to his hand. He asserts, ''It would have been impossible to have used any force without some injury or some effect to his hand.'' In this connection it must be borne in mind that defendant had been a professional prize fighter. In light of this background of training and experience and his wife's frail build, it is a reasonable inference that he could hit her in the head with his closed fist and cause the fatal injury without receiving any injury to his hand. Moreover, the fatal injury may well have been the result of the defendant's deliberate act in causing her

---

[2]The jury was so instructed.

to fall and strike her head against a hard surface, which would not necessarily have caused any injury to his hand.

Defendant emphasizes the testimony indicating he displayed tenderness toward his wife when Cook accompanied him to his home prior to their going bowling. In view of defendant's knowledge that his wife was unconscious and severely injured, his failure to seek assistance or medical aid for her, and his leaving her alone in that condition, the jury may well have been convinced that he was "putting on an act."

## The Degree of the Crime

Defendant argues that the verdict of second degree murder cannot be sustained because the evidence fails to establish malice, which is an essential element of that crime; he asserts that the most culpable offense of which he can be convicted is manslaughter. We cannot agree with this conclusion.

Malice may be express or implied. "It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188.)

There is no substantial basis in the evidence for a finding of express malice. Defendant's conviction of second degree murder must therefore rest upon a finding of implied malice. "The implied malice as described in section 188 of the Penal Code requires no specific intent to kill, and the distinguishing characteristic between murder and manslaughter is malice rather than the presence or absence of an intent to kill." (*People* v. *Mears*, 142 Cal.App.2d 198, 204 [298 P.2d 40].) "If the jury found that there was no considerable provocation and that the defendant acted with an 'abandoned and malignant heart' the 'malice' would be 'implied' and the murder would be of the second degree." (*People* v. *Bender*, 27 Cal.2d 164, 178 [163 P.2d 8].)

It is clear from the evidence that there was no showing of "considerable provocation" sufficient to reduce the offense to voluntary manslaughter. In fact, defendant insists that he did not voluntarily kill his wife.

We must thus examine the evidence attending the killing to ascertain whether the jury was justified in impliedly finding that defendant acted with an "abandoned and malignant heart." The medical evidence discloses that the deceased had sustained numerous injuries on various parts of her body,

many of which were unrelated to the fatal skull fracture. From this the jury reasonably could draw the inference that defendant inflicted a severe beating upon his wife, during the course of which she received a nine inch skull fracture. The conclusion that defendant had beaten his wife severely finds support in his own admission that he thought he "killed her this time." That death resulting under such circumstances constitutes murder in the second degree is held in *People* v. *Burns, supra,* p. 534. (See also *People* v. *Tubby,* 34 Cal.2d 72 [207 P.2d 51]; *People* v. *Cayer,* 102 Cal.App.2d 643 [228 P.2d 70].)

In determining whether defendant's acts disclosed an abandoned and malignant heart, thus establishing implied malice, the jury was entitled also to consider defendant's conduct following the fatal injury. (*People* v. *Johnson,* 203 Cal. 153, 164 [263 P. 524]; *People* v. *Riggins,* 159 Cal. 113, 120 [112 P. 862]; *People* v. *Shears,* 133 Cal. 154, 158 [65 P. 295]; *People* v. *Garnett,* 9 Cal.App. 194, 202 [98 P. 247].) Defendant's failure to seek the assistance of his friends or to obtain medical aid even though he knew that his wife was seriously injured indicates a heartless attitude and callous indifference toward her. Defendant went bowling that evening, leaving his wife alone; he simply let her die. His flight to Las Vegas the next morning when he was unsure of his wife's condition further reflects his depravity.

The jury could reasonably conclude from all these circumstances that defendant acted with an "abandoned and malignant heart." This establishes implied malice and sustains the verdict of second degree murder. (See *People* v. *Burns, supra; People* v. *Martina,* 140 Cal.App.2d 17 [294 P.2d 1015].)

Defendant's argument that the evidence does not support the degree of the crime overlooks the well established principle that "it is exclusively the province of a jury to determine the degree of crime when there is any evidence in the case which will support the determination." (*People* v. *Isby,* 30 Cal.2d 879, 891 [186 P.2d 405]; *People* v. *Cook,* 15 Cal.2d 507, 515 [102 P.2d 752]; *People* v. *Mahatch,* 148 Cal. 200, 203 [82 P. 779].)

Defendant relies principally upon *People* v. *Munn,* 65 Cal. 211 [3 P. 650], in which a conviction of second degree murder for a death resulting from a fist fight was reversed. But the court in the Munn case said (p. 213) : "If the means employed be not dangerous to life, or, in other words, if the blows

causing death are inflicted with the fist, *and there was no aggravating circumstances*, the law will not raise the implication of malice aforethought, which must exist to make the crime murder. The distinguishing characteristic respecting the two crimes of murder and manslaughter is malice. Without the presence of this element of malice the crime does not reach the higher degree of murder, but amounts simply to manslaughter.'' (Italics added.) We have already pointed out the aggravating circumstances in the instant case which showed an abandoned and malignant heart on the part of defendant, thus giving rise to the implication of malice.

Defendant also relies upon *People* v. *McManis*, 122 Cal. App.2d 891 [266 P.2d 134]; *People* v. *Lee*, 44 Cal.App.2d 84 [111 P.2d 908]; *People* v. *Miller*, 114 Cal.App. 293 [299 P. 742]; *People* v. *Chutuk*, 18 Cal.App. 768 [124 P. 566], and *People* v. *Stokes*, 11 Cal.App. 759 [106 P. 251]. None of these cases is helpful. In each of them a conviction for manslaughter was affirmed, and the question of malice was not involved. The McManis decision points out (as did the Munn case) that death resulting from an assault and battery *without aggravating circumstances* is manslaughter. The presence of such aggravating circumstances, if sufficient to raise the implication of malice, makes the killing murder. In the Miller case the court distinguishes manslaughter from murder, stating that the presence of malice makes the crime murder. The other cases merely review the evidence and instructions, and find support for the manslaughter convictions.

### The Failure to Give An Instruction On Excusable Homicide

Defendant contends that the trial court erred in failing to give an instruction defining excusable homicide as set forth in Penal Code, section 195.[3] There are two answers to this contention. The first is that the evidence did not warrant the giving of an instruction on that subject. Defendant did not rely on that theory. His claim throughout was that decedent's death was due to an accidental fall; that

---

[3]Penal Code, section 195, reads as follows:
''Homicide is excusable in the following cases:
''1. When committed by accident and misfortune, in lawfully correcting a child or servant, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent.
''2. When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in cruel or unusual manner.''

he was in nowise responsible for the fatal injury. The evidence was insufficient to support a verdict on the theory of excusable homicide.

The second answer is that defendant did not request such an instruction. The court fully and fairly instructed the jury on first and second degree murder and manslaughter as well as on the presumption of innocence, reasonable doubt, burden of proof and the principle for testing the sufficiency of circumstantial evidence. If defendant desired an instruction on excusable homicide he should have requested it. In the premises it was not error for the court not to give such an instruction sua sponte. (*People* v. *Klor*, 32 Cal.2d 658, 662 [197 P.2d 705] ; *People* v. *Andary*, 120 Cal.App.2d 675, 683 [261 P.2d 791] ; *People* v. *Williams*, 153 Cal.App.2d 5, 9-10 [314 P.2d 161].)

The principal issues in this case are factual. The jury and the court (in denying defendant's motion for a new trial) have determined the facts and the inferences to be drawn therefrom adversely to him. ▇▇▇ The basic difficulty with defendant's arguments is that he would have this court reweigh the evidence and draw inferences contrary to those drawn by the jury. Under firmly established principles we are not at liberty to do this. (*People* v. *Gould*, 111 Cal.App. 2d 1, 8 [243 P.2d 809].)

The judgment is affirmed.

Ashburn, J., and Herndon, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 27, 1958.