[Crim. No. 3071. Third Dist. July 19, 1960.]

THE PEOPLE, Respondent, v. ERNEST LOUIS TOTH, Appellant.

Robert W. Cole, Public Defender, and Kenneth M. Wells, Assistant Public Defender, for Appellant.

Stanley Mosk, Attorney General, Doris H. Maier and Raymond M. Momboisse, Deputy Attorneys General, for Respondent.

SCHOTTKY, J.—Ernest Louis Toth was found guilty of murder in the second degree. His motion for a new trial was denied. He has appealed from the judgment and from the order denying his motion for a new trial.

Appellant makes a number of contentions in arguing for a reversal of the judgment and order, but before discussing them, we shall summarize the evidence as shown by the record.

For approximately three months prior to the date of the offense with which he was charged, the appellant had been employed as a stableman for Kenneth Chestnut and lived in a house provided for him on his employer's property. Living with the appellant was Theresa Newberry Toth, his common-law wife of some 10 years. At approximately 6:30 a. m., June 22, 1959, Mr. Chestnut was awakened by the appellant. He testified that appellant came up to his bedroom window and hollered that he wished Mr. Chestnut to call the doctor as he (the appellant) "thought that his wife was dead." Mr. Chestnut told the appellant to come on in the house and make the call himself, but the door was locked. After trying the door appellant ran back to his house, got into his car and drove away.

Mr. Chestnut then went to the appellant's house where he found Mrs. Toth (hereinafter referred to as the victim) lying on the bed with her feet toward the head of the bed, her arms stretched out, and her face partly turned over on the left side. He also testified that there was blood on the sheet in front of and under her face and she appeared to be dead. The wife of the witness called the rescue squad and the police. The rescue squad arrived first and then the appellant returned with the victim's son and daughter-in-law, and lastly, the police.

Beside several superficial injuries about the face and mouth of the victim, there were multiple hemorrhagic areas between the scalp and skull (one in the frontal area, one at the top of the skull, one over the occipital area, one in front of the left ear, and lastly, one behind the left ear). The medical expert testified that any one of these injuries could have caused the subarachnoid hemorrhage at the base of the brain, which was the direct cause of death. The doctor further testified that the injuries found on the skull were caused by blows, and because of the diverse location of them it was extremely unlikely that they resulted from a fall. It was also his opinion that the damage to the skull, i.e., the subcutaneous bleeding, did not result from the use of any instrument other than a human hand, and that from the extent of the injuries the blows must have been rendered either with the heel of the hand or the fist. This part of the testimony tended to establish that the hemorrhage did not result from natural weakness in any of the blood vessels in the brain of the victim.

The appellant in an extrajudicial statement, which was admitted into evidence over his objection, and also as a witness, admitted that he beat the victim on numerous occasions and also on the night before her death. However he maintained that he never used anything but the flat of his hand and the intensity of the blows was no greater than that used to discipline a child. He also testified that the victim fell only once the night before her death and did not at that time strike her head. Finally, on cross-examination, he admitted that he had been a professional boxer (some 40 bouts) and that one never forgets the skill once it has been mastered. He stated that both he and the victim had been drinking, which fact was indicated by the medical testimony; that the victim had become loud; that he told her to keep quiet; and that when she did not he slapped her. He stated

that she then passed out and he picked her up and dumped her on the bed; that he returned to the living room, turned on the air conditioner and went to sleep; that when he awoke the next morning he went into the bedroom and found the victim lying on the bed in the position hereinbefore described.

Appellant's first contention is that the corpus delicti of a criminal homicide was not established prima facie and therefore the court committed error in admitting the extrajudicial statement over the objection of the appellant.

The law applicable to this contention has been well stated in the recent case of *People* v. *Misquez,* 152 Cal.App.2d 471, at page 477 [313 P.2d 206], as follows:

"In a murder charge the corpus delicti consists of two elements: the death of the alleged victim and the existence of some criminal agency as the cause. (*People* v. *Cullen,* 37 Cal. 2d 614, 624 [234 P.2d 1], and cases cited.) The corpus delicti must be proved by evidence independent of the extrajudicial statements of the accused. But, as a prerequisite to the reception of a defendant's extrajudicial statement in evidence, the corpus delicti need not be established by proof as clear and convincing as is necessary to establish guilt. (25 Cal.Jur.2d 510-513, and cases cited.) The corpus delicti need only be shown by some evidence, and a prima facie showing that the alleged victim met death by a criminal agency will suffice. (*People* v. *Corrales,* 34 Cal.2d 426, 429 [210 P.2d 843] ; *People* v. *Mehaffey,* 32 Cal.2d 535, 545 [197 P.2d 12], and cases cited.) Furthermore, the corpus delicti may be established wholly by circumstantial evidence and by inferences reasonably derived therefrom. (*People* v. *Corrales, supra,* 34 Cal.2d 426, 429; *People* v. *Mehaffey, supra,* 32 Cal.2d 535, 545.) And such evidence need not connect defendant with the commission of the crime. (*People* v. *Amaya,* 40 Cal.2d 70, 76 [251 P.2d 324].)'' (See also *People* v. *Ogg,* 159 Cal.App.2d 38 [323 P.2d 117].)

We do not agree with appellant's contention that the corpus delicti of a criminal homicide was not established prima facie. All that was required to prove such a prima facie case was to show a reasonable probability that the criminal act of another was the direct cause of the death of the deceased. (*People* v. *Ives,* 17 Cal.2d 459 [110 P.2d 408].) We believe from the testimony of the autopsy surgeon hereinbefore set forth it can reasonably be inferred that the death of the deceased was caused by numerous blows struck either with the heel of the hand or the fist and that it was extremely unlikely that the injuries found

on the skull resulted from a fall. Indeed the facts in the instant case bear a striking similarity to the facts in the case of *People* v. *Misquez, supra,* in which the court said at page 478:

"It is undisputed that Margaret Ann's body was covered with bruises and that death was caused by violent blows to her abdomen and head occasioned by sudden contact with a hard object. The question for the trier of fact was whether the blows occurred through an accident, a fall or kick, or were unlawfully administered. It was the autopsy surgeon's opinion that the child was not likely to have sustained such severe injuries while acting by herself and that an accidental fall would account neither for the nature of the blows nor for the existence of the many bruises on her body. It was also his opinion that the injuries to her head and abdomen could have been caused by blows from the stick and that the latter injury could have been caused by throwing the child against a bedpost.

"*People* v. *Bonilla,* 114 Cal.App. 219 [299 P. 784], involved a similar question. In that case the defendant was accused of murdering his wife and objection was made to the introduction of his extrajudicial statements on the ground that the corpus delicti had not been established. Evidence which tended to show that the fatal injuries were due to a blow on the head from a blunt instrument rather than to an accidental fall from an automobile was held sufficient to show the corpus delicti. The medical evidence in the present case which tended to show that Margaret Ann's injuries were not inflicted accidentally is at least as compelling as that in the Bonilla case. We cannot say that there was an insufficient prima facie showing that her death was due to a criminal agency."

We conclude therefore that a prima facie case that the death of the deceased was caused by unlawful means having been established there was no error in admitting into evidence the extrajudicial statement of appellant.

Appellant contends also that the court committed error in admitting into evidence the photographs which showed the body of the victim on the bed where she had been dumped by the appellant and also photographs of the victim's body which were taken at the time of the autopsy. He argues that these photos were introduced merely to inflame the jurors and served no legitimate purpose because the issue in this case was what caused the death.

This contention cannot be sustained. In the trial of a charge of murder in the second degree it is essential for the People to establish malice aforethought. Such malice may be shown by the extent and severity of the injuries inflicted upon the victim and by the condition in which the victim was left by her attacker. This is what the People sought to establish by these photographs.

As was stated in *People* v. *Cheary,* 48 Cal.2d 301, 312 [309 P.2d 431] :

". . . Although it is error to receive in evidence gruesome photographs of a homicide victim designed primarily to arouse the passions of the jury (*People* v. *Burns,* 109 Cal.App.2d 524, 541-542 [241 P.2d 308, 242 P.2d 9] ; *People* v. *Redston,* 139 Cal.App.2d 485, 490-491 [293 P.2d 880]), such photographs are admissible when they are relevant to the issues before the court and their probative value is not outweighed by the danger of prejudice to the defendant. (*People* v. *Reese,* 47 Cal.2d 112, 120-121 [301 P.2d 582].) Whether the probative value of a particular photograph outweighs its possible prejudicial effect is a question to be resolved by the trial court in the exercise of its judicial discretion. (*People* v. *Reese, supra,* 47 Cal.2d at 120 ; *People* v. *Burns, supra,* 109 Cal.App.2d at 542.) The photographs in question were admitted in connection with the pathologist's testimony regarding the extent of the decedent's injuries and the cause of her death, the latter being a matter disputed by defendant. The photographs are corroborative of the pathologist's testimony and help to show the extent of the decedent's injuries. . . ."

Appellant contends further that it was error to allow the district attorney to cross-examine him concerning the following events:

1. The attack on the victim in Klamath Falls, Oregon, in 1951, in which he broke or rebroke the victim's jaw.

2. The attack on the victim in Culver City, California.

3. The various times when the victim left the appellant.

Appellant attacks this cross-examination first on the ground that it was error to introduce evidence of prior offenses, and secondly, that the purpose of the cross-examination was not to show the truth of the facts asserted in the questions but solely for the purpose of raising an implication of assaults and a criminal disposition of the appellant by asking such questions. In this same regard he argues that the instructions given with regard to this evidence were erroneous.

There is no merit in this contention. In the instant case the appellant on his direct examination painted a general picture

of an amicable relationship which existed between him and his companion. He testified that he loved the deceased very much and then added, ''We were very much in love.'' He was asked, ''Were you happily married?'' and he replied, ''Yes, we were.'' Subsequently he was asked, ''You loved your wife?'' and answered, ''We were both very much in love with each other.''

At another point he testified on direct examination that he did not hit her with his fist and that he absolutely had not hit her with all of his force. Rather, he hit her with ''the palm of my hand and tips of my fingers.'' In fact, the force he used was so mild that he would not at any time hesitate to spank his grandchildren with the same amount of force.

The prosecution had a right to show that this testimony was false, to show that in the past the appellant had brutally beaten the deceased, and that the so-called therapeutic treatment administered by him was a brutal beating which exceeded all reasonable bounds. This is what the cross-examination of appellant sought to reveal. As the appellant had on his own direct examination shown that he had previously beaten the victim and that she had left him, the prosecution had a right to examine him in regard to the specific instances involved to ascertain whether or not the picture was truly as given by the appellant on his direct examination. Even if appellant had not testified as to the altercations with his wife, the People would have been entitled to cross-examine him on this matter in order to show the prior violent relationship between the parties to prove malice aforethought. Thus, for this reason the cross-examination was proper.

 The leading case on the scope of cross-examination of a defendant in a criminal case is *People* v. *Zerillo*, 36 Cal.2d 222 [223 P.2d 223], in which the court stated at page 227:

''Section 1323 of the Penal Code provides: 'A defendant in a criminal action or proceeding cannot be compelled to be a witness against himself; but if he offers himself as a witness, he may be cross-examined by the counsel for the people as to all matters about which he was examined in chief. . . .' This does not mean that the cross-examination must be confined to a mere categorical review of the matters, dates or times mentioned in the direct examination. [Citing cases.] It may be directed to the eliciting of any matter which may tend to overcome or qualify the effect of the testimony given by him on his direct examination. [Citing cases.] Defendant argues that the 1935 amendment to section 1323, giving counsel

the power to comment on 'the failure of the defendant to deny any evidence or facts in the case against him,' necessarily indicates that a defendant may testify and yet neither have to explain or deny facts introduced against him. This is true only to the extent that such 'evidence or facts' are not within the scope of his direct examination, since the section expressly states that a defendant 'may be cross-examined . . . as to all matters about which he was examined in chief.' It is well settled that the section as it existed prior to 1935 did not have the effect of confining the cross-examination of an accused to any narrower limits than in the case of any other witness [citing cases], and there is nothing in the 1935 amendment to indicate any intent to establish a special rule governing the scope of cross-examination of a defendant in a criminal case. (See 3 Wharton on Criminal Evidence [11th ed. 1935] § 1323.) If a defendant takes the stand and makes a general denial of the crime with which he is charged the permissible scope of cross-examination is very wide. (See *People* v. *Gallagher,* 100 Cal. 466, 473-476 [35 P. 80]; *People* v. *Creeks,* 170 Cal. 368, 378, 380 [149 P. 821].) . . .''

There is no merit in appellant's contention that the instructions given by the court to the jury concerning the evidence of prior offenses were erroneous and prejudicial.

During the course of the trial the court told the jury: ''Yesterday afternoon the Court admitted certain evidence which, of course, is admitted for limited purposes. That is the evidence of prior assaults by the defendant and prior difficulties between the defendant and the deceased were admissible in evidence solely for the purpose of proving motive, malice, and the state of relationship between the defendant and the deceased at the time of and prior to the alleged homicide and such evidence as found by you to be true may be only considered for that purpose and that purpose alone. All right, go ahead.''

The jury was instructed that ''Evidence of prior assaults by the defendant and prior difficulties between the defendant and Theresa Newberry were admissible in evidence solely for the purpose of proving motive, malice and the state of feeling between the defendant and the deceased at the time of and prior to the alleged homicide and such evidence, if found by you to be true, may be considered by you for that purpose and that purpose alone.''

These instructions are a proper statement of the law applicable to the evidence introduced.

More serious is appellant's contention that the trial court committed prejudicial misconduct which resulted in reversible error by its remarks directed toward defense counsel.

During the presentation of the People's case in chief, the defense counsel moved the trial court to request the California State Bureau of Criminal Identification and Investigation to analyze certain spots which appeared upon an egg carton then introduced for identification by the defendant for the purpose of cross-examination of witness Oren Baker. The court refused to rule at that time, stating that the court would wait to see if the exhibit became material.

Several days later, during the presentation of the defendant's case, the defense counsel again moved the trial court to request that the California State Bureau of Criminal Identification and Investigation examine the substance on the egg carton.

The court stated that it did not see the materiality of the egg carton. Counsel for appellant then stated that if an analysis showed human blood on the egg carton it could have some materiality. The following then appears in the record:

"THE COURT: When Mr. Gilmore was here all you had to do was ask. No use in delaying. MR. WELLS: Your Honor, I talked to Mr. Green over the telephone and he told me that he could not accept these things from the Public Defender's office. Mr. Green is a chemist in the C.I.I. THE COURT: I told you when he was here, I believe I mentioned something about it to you at the time, if you wanted him to examine it, say so. This is only a delay now. MR. WELLS: It is not a delay, your Honor. Your Honor put me off in open court when I requested it of the Court. MR. PUGLIA: Your Honor, it seems to me in view of the fact that the Public Defender's office has had this in their possession for a period of two months without making any attempt to run a test on it, a little less than two months before the attempt was made, that the Court should not be placed in such a position at this time when this case is almost, we have almost completed the testimony in this case. THE COURT: Have you got any other witnesses? MR. WELLS: No, your Honor, not at this time. MR. PUGLIA: The testimony of this witness right here was a clear indication that the Public Defender had at hand available means to run a test on this egg carton, and they failed to do so. Now, why they didn't approach these laboratory —— THE COURT: Of course I am very much interested. I have tried all my time since I have been

on this bench, Counsel, this is directed to you, Mr. Wells, to see that any, all clients, all persons brought here received the proper treatment. MR. PUGLIA: We are interested in that, too, your Honor. THE COURT: And I don't understand. This looks to me like something I am not used to have coming into my court. This type of activity. MR. WELLS: I hope the Court isn't suggesting anything —— THE COURT: From anybody. MR. WELLS: I hope the Court isn't suggesting anything as far as my own integrity is concerned? THE COURT: I am. MR. WELLS: You are? THE COURT: Yes. MR. WELLS: And I am going to request the Court to declare a mistrial in this case because of prejudicial remarks, and there is grounds for a mistrial. THE COURT: What is grounds for a mistrial? MR. WELLS: Your statement to myself, and if the Court means to imply —— THE COURT: I think you should have used more diligence, is what I think. MR. WELLS: And again I am going to request the Court to declare a mistrial in this case, because of prejudicial remarks at this time. THE COURT: You know it is ridiculous what you are saying. MR. WELLS: It is not ridiculous, your Honor. THE COURT: I think you should have had this examined before. MR. WELLS: There is testimony that there were attempts but they took too long to determine, and as I can show you in the transcript, your Honor, I requested in open court that this be examined and the Court put me off.''

Appellant argues that the remarks of the court questioned the integrity of his counsel and were so highly prejudicial to appellant's case as to constitute reversible error. We agree with appellant that the remarks of the court which apparently reflected upon the integrity of appellant's counsel should not have been made, but we do not agree with his contention that they require a reversal of the judgment. We believe that in view of the fairness which characterized the court's conduct of the entire trial the remarks complained of did not prejudice appellant in the eyes of the jury. The court was no doubt understandably and justifiably provoked by what it considered the dilatory tactics of appellant's. counsel, and the remarks were undoubtedly intended as a criticism of counsel's lack of diligence rather than as a reflection upon the integrity of counsel. It is to be noted that the court did order that the egg carton be examined by the state criminologist; that it was so examined; that Mr. Johnson of the State Bureau of Criminal Identification did testify as to the result of his analysis; and that the egg carton was admitted into evidence.

What was said in *People* v. *Oliveria,* 127 Cal. 376, at page 382 [59 P. 772], is applicable:

"The remark made by the judge to defendant's counsel during the progress of the trial is not reversible error. The manner of counsel in asking many apparently immaterial questions and repeating them seems to have exhausted the patience of the judge and to have merited at least some rebuke. The language used by the judge in addressing counsel evidently was not that of a Chesterfield. The same thing probably could have been said in language more courteous and with more regard to feelings of counsel; yet we do not think the remark was such as to have prejudiced the rights of the defendant."

The law was similarly stated in *People* v. *MacDonald,* 167 Cal. 545, 550 [140 P. 256], wherein it was held:

". . . But an affront to counsel, or a wounding of his feelings, although unjustified, will not furnish a basis for appellate review, unless the rights of the defendant are in some way prejudiced, and it cannot be said that the characterization of counsel's conduct as 'ungentlemanly and unprofessional' was calculated to work substantial injury to the case of the defense. (*People* v. *Oliveria,* 127 Cal. 376 [59 P. 772]; *People* v. *Modina,* 146 Cal. 142 [79 P. 842]; *People* v. *Casselman,* 10 Cal. App. 234 [101 P. 693].)"

Appellant contends further that the evidence in the case does not support the verdict of murder of the second degree and that the court erred in instructing the jury on the crime of murder. Appellant was charged with the crime of murder in the second degree, and the court fully and correctly instructed the jury as to the law applicable to murder in the second degree and manslaughter. Appellant's argument as to the instructions is predicated upon his contention that the evidence is insufficient to sustain the judgment.

 Appellant argues that the evidence was insufficient to support the verdict of murder in the second degree because it failed to show, first, that there was an unlawful killing, and, second, it completely failed to show malice aforethought.

We are unable to agree with appellant's contention that the evidence is insufficient to sustain the judgment. In the recent case of *People* v. *Ogg,* 159 Cal.App.2d 38 [323 P.2d 117] (hearing denied), the facts were quite similar to the facts in the instant case. The contention was made upon appeal that the evidence was insufficient to sustain the verdict of murder in the second degree. What the court said at page 48 is quite applicable to the instant case:

"Before the verdict of a jury which has been approved

by the trial court can be set aside on the ground of the insufficiency of the evidence it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. ▮ We must assume in support of the judgment the existence of every fact which the jury could reasonably deduce from the evidence. ▮ If the circumstances reasonably justify the verdict, the opinion of the reviewing court that those circumstances might also be reconciled with the innocence of the defendant will not warrant a reversal. (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Frankfort*, 114 Cal.App.2d 680, 689 [251 P.2d 401].)

''Applying these principles, it is clear that there is ample evidence to sustain the verdict and judgment. In addition to the evidence mentioned above touching upon the question of the corpus delicti, the jury had before it the fact of defendant's use of a false name following his flight to Las Vegas, his incriminating statements to Cook and the representative of the sheriff's office in Las Vegas, the decedent's threat to turn him over to his probation officer for writing checks on her account, and his past conduct in striking her. Other circumstances need not be enumerated for these adequately support the verdict that defendant was criminally responsible for his wife's death.

''*People* v. *Burns*, 109 Cal.App.2d 524 [241 P.2d 308, 242 P.2d 9], is, in many of its aspects, similar to the case at bar. There, as here, the defendant claimed the death of his female companion was the result of falls. There was no eyewitness. Her physical condition, however, indicated that she had received a beating. Although the conviction was reversed on other grounds, the court determined that there was sufficient evidence to sustain a verdict of second degree murder. In rejecting defendant's explanation as to the cause of death, the court stated (p. 534) : 'Assuming that the evidence is also susceptible of the inference that her death might have been due to falls, that does not justify us in reversing the verdict. ''. . . the mere fact that the evidence is susceptible of two inferences, one of innocence and one of guilt would not warrant a reversal of conviction. . . . The appellate court is bound by the findings of the jury where it rejects the hypothesis of innocence if there is substantial evidence to support the finding of guilt as the more reasonable of the two hypotheses. Under this rule, the conviction of the defendant herein is amply supported by the evidence.'' (*People* v. *Crawford*, 41 Cal.App.2d 198, 205 [106 P.2d 219].)'

"In this connection defendant argues in effect that the evidence in this case is as consistent with the theory that the deceased's injuries were caused by a fall as it is with the theory that she was the victim of foul play. ■■■ But the rule that the circumstances must be consistent with guilt and inconsistent with any hypothesis of innocence is a rule of instruction for the jury, and is not the rule for the guidance of the court on review. (*People* v. *Cullen,* 37 Cal.2d 614, 625 [234 P.2d 1]; *People* v. *Newland, supra,* p. 682; *People* v. *Perkins,* 8 Cal.2d 502, 511 [66 P.2d 631].)

"Defendant contends that the People's entire case falls because the evidence fails to show any injury to his hand. He asserts, 'It would have been impossible to have used any force without some injury or some effect to his hand.' In this connection it must be borne in mind that defendant had been a professional prize fighter. In light of this background of training and experience and his wife's frail build, it is a reasonable inference that he could hit her in the head with his closed fist and cause the fatal injury without receiving any injury to his hand. Moreover, the fatal injury may well have been the result of the defendant's deliberate act in causing her to fall and strike her head against a hard surface, which would not necessarily have caused any injury to his hand.

"Defendant emphasizes the testimony indicating he displayed tenderness toward his wife when Cook accompanied him to his home prior to their going bowling. In view of defendant's knowledge that his wife was unconscious and severely injured, his failure to seek assistance or medical aid for her, and his leaving her alone in that condition, the jury may well have been convinced that he was 'putting on an act.'

## "THE DEGREE OF THE CRIME

"Defendant argues that the verdict of second degree murder cannot be sustained because the evidence fails to establish malice, which is an essential element of that crime; he asserts that the most culpable offense of which he can be convicted is manslaughter. We cannot agree with this conclusion. ■■■ "Malice may be express or implied. 'It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' (Pen. Code, § 188.)

"There is no substantial basis in the evidence for a finding

of express malice. Defendant's conviction of second degree murder must therefore rest upon a finding of implied malice. 'The implied malice as described in section 188 of the Penal Code requires no specific intent to kill, and the distinguishing characteristic between murder and manslaughter is malice rather than the presence or absence of an intent to kill.' (*People* v. *Mears*, 142 Cal.App.2d 198, 204 [298 P.2d 40].) 'If the jury found that there was no considerable provocation and that the defendant acted with an "abandoned and malignant heart" the "malice" would be "implied" and the murder would be of the second degree.' (*People* v. *Bender*, 27 Cal.2d 164, 178 [163 P.2d 8].)

"It is clear from the evidence that there was no showing of 'considerable provocation' sufficient to reduce the offense to voluntary manslaughter. In fact, defendant insists that he did not voluntarily kill his wife.

"We must thus examine the evidence attending the killing to ascertain whether the jury was justified in impliedly finding that defendant acted with an 'abandoned and malignant heart.' The medical evidence discloses that the deceased had sustained numerous injuries on various parts of her body, many of which were unrelated to the fatal skull fracture. From this the jury reasonably could draw the inference that defendant inflicted a severe beating upon his wife, during the course of which she received a nine inch skull fracture. The conclusion that defendant had beaten his wife severely finds support in his own admission that he thought he 'killed her this time.' That death resulting under such circumstances constitutes murder in the second degree is held in *People* v. *Burns, supra,* p. 534. (See also *People* v. *Tubby,* 34 Cal.2d 72 [207 P.2d 51]; *People* v. *Cayer,* 102 Cal.App.2d 643 [228 P.2d 70].)''

 We conclude that the evidence was sufficient to support the verdict that appellant was guilty of murder in the second degree and that the court did not err in instructing the jury as to the law applicable to second degree murder.

No other points raised require discussion.

The judgment and order are affirmed.

Van Dyke, P. J., and Warne, J. pro tem.,* concurred.

A petition for a rehearing was denied August 12, 1960, and appellant's petition for a hearing by the Supreme Court was denied September 7, 1960.

*Assigned by Chairman of Judicial Council.