## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SHASTA COUNTY,<br><br>Respondent;<br><br>SHANNON LEONARD RAWLINS,<br><br>Real Party in Interest. | C098228<br><br>(Super. Ct. No. 23F00225)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the nonpublished opinion filed herein on November 27, 2023, be modified as follows:

1.  On page 2, the third sentence of the first full paragraph, beginning "At the preliminary hearing" is deleted and the following sentence is inserted in its place:

1

At the preliminary hearing, the court viewed and heard a surveillance video (defense exhibit No. A) of the incident with a transcript, and heard the testimony of Detective Jeremiah Kasinger who summarized his review of the video and Rawlins's subsequent cooperation with law enforcement.

There is no change in the judgment.

Real party in interest's petition for rehearing is denied.

BY THE COURT:


_____/s/_____
EARL, P. J.


_____/s/_____
MESIWALA, J.


_____/s/_____
KEITHLEY, J.*

---

*      Judge of the Butte County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C098228 |
| Petitioner, | (Super. Ct. No. 23F00225) |
| v. | |
| THE SUPERIOR COURT OF SHASTA COUNTY, | |
| Respondent; | |
| SHANNON LEONARD RAWLINS, | |
| Real Party in Interest. | |

Following a preliminary hearing, a magistrate held defendant Shannon Leonard Rawlins to answer to a charge of second degree murder for the death of Miguel Padilla. Padilla died from a head injury sustained when Rawlins punched him and he fell to the floor.  The superior court subsequently granted Rawlins's motion to dismiss the murder

charge under Penal Code section 995[1] but held Rawlins to answer to voluntary manslaughter. Arguing that there was sufficient evidence of implied malice presented at the preliminary hearing to support the murder charge, the People seek a writ of mandate to compel respondent superior court to reinstate the charge dismissed. Mindful of the exceedingly low standard required at the preliminary hearing, we agree that the murder charge must be reinstated. We therefore grant the petition.

### FACTUAL AND PROCEDURAL BACKGROUND

The prosecution charged Rawlins with murder in violation of section 187, subdivision (a). The prosecution also alleged several factors relating to sentencing. At the preliminary hearing, the People presented surveillance video of the incident with a transcript, as well as the testimony of Detective Jeremiah Kasinger who summarized his review of the video and Rawlins's subsequent cooperation with law enforcement. The following was adduced at the preliminary hearing.

On January 12, 2023, Rawlins was an employee of a convenience store. Just prior to the crime alleged in this case, an individual named Todd Mort was at the back of the store, making coffee and conversing with Rawlins. As Rawlins moved from the back of the store to the register area, Miguel Padilla entered the store.

Padilla had an unsteady gait as though he had consumed alcohol or had something medically wrong with his leg. Rawlins greeted Padilla and asked if he could help him. Padilla asked where the three-packs of beer were located, and Rawlins directed Padilla to the relevant part of the store.

Padilla and Mort began staring at each other. Mort asked Padilla if he could help him. Padilla said, "Yea, what the fuck are you doing?" Mort replied he was making a cup of coffee. Padilla said, "Ahh, just trippin out, you got a fuckin problem with me?"

---

[1] Undesignated statutory references are to the Penal Code.

Padilla and Mort then began to argue as they walked toward each other. They came within two to three feet of each other at which time Mort threatened to throw a hot cup of coffee in Padilla's face if he didn't back away, and Padilla held up the three-pack of beer in his hand.

At this time, Rawlins came from behind the register in the front of the store to the back of the store, put himself between Padilla and Mort, and said, "Hey guys. Come on. You have to stop. . . . Hey, not here. We're not going to do that." Rawlins then walked back to the register. Padilla and Mort argued for a few more seconds before Mort went back to making his coffee, and Padilla walked to the register with the three-pack of beer.

Rawlins and Padilla had a "normal" conversation at the register while Rawlins began to ring up the beer and cigarettes for Padilla. Mort exited the store, leaving only Rawlins and Padilla inside for the duration of the incident. The tone of the conversation between Rawlins and Padilla thereafter changed, but due to audio problems with the video, the reason for the change is unclear. Padilla said, "That's not my fucking problem," and Rawlins responded, "Don't yell at me bro." Padilla said he wasn't trying to yell and repeated "It's not my fuckin problem." Rawlins replied, "You aren't talking to me like that, bro." Rawlins told Padilla to lower his voice, and Padilla said, "Hey, fuck you."

As Rawlins was standing behind the register, Padilla was standing on the other side of the register, holding his wallet in his hand. Padilla made no threats toward Rawlins and did not challenge Rawlins to fight in any way. However, Rawlins left the area behind the register and approached Padilla, saying that Rawlins had been respectful, and something to the effect of "You're not going to talk to me like that, bro." Rawlins closed the space between them so that he was within a foot of Padilla. Padilla was standing at a canted angle and was not squared off with Rawlins. Padilla moved his arm up "in a motion most people would do if you're trying to keep someone out of your personal space."

Within three seconds, Rawlins used both his hands to forcibly shove Padilla to the ground and Padilla landed on his back. Rawlins leaned forward in an effort to help Padilla up, and Padilla made a motion as if to grab or kick Rawlins. Rawlins repeatedly told Padilla to leave the store, and Padilla climbed back to his feet, saying something like, "Motherfucker."

Padilla then attempted to kick and punch Rawlins. Padilla was approximately two to three feet away from Rawlins at this time.

Rawlins then stepped back and threw a punch at Padilla, hitting him on the right side of his neck and lower jaw area, causing Padilla to instantly fall to the ground. There was a loud noise that may have been Padilla striking his head or upper body on the concrete. Rawlins told Padilla to get out of the store as Padilla struggled to stand up.

Rawlins told Padilla to leave the store and pointed toward the exit. Padilla took another step toward Rawlins in a fighting stance, then took a step back. Rawlins struck Padilla in the lower face area again. Padilla fell instantly onto his back and struck his head on the merchandise shelving and the floor. Padilla started making a snoring noise and did not stand back up. Rawlins exited the store and called 911.

The floor was tile over concrete. Detective Kasinger described it as being on the harder side of the continuum.

Law enforcement, emergency medical, and fire department personnel came to the store. Padilla subsequently died on or about January 14, 2023. The cause of Padilla's death was "blunt head trauma" with a severe skull fracture on the right side of his head. The location of the skull fracture was consistent with Padilla's head striking the shelving area and/or concrete floor.

Rawlins and Padilla were approximately the same weight but there was a height difference. Padilla was approximately 6 feet 3 inches to 6 feet 4 inches tall, 250 pounds, and Rawlins is approximately 5 feet 11 inches to six feet tall and 250 to 260 pounds.

4

Rawlins admitted that he thought Padilla acted like he had had a few beers, but claimed he did not think Padilla was drunk; he said he never heard Padilla slur his words.

At no time during the altercation in this case did Padilla display a weapon toward Rawlins. Although Padilla carried a pocketknife clipped to his pocket, Rawlins told Detective Kasinger that Padilla never mentioned, reached for, or did anything with the knife and that Rawlins was not worried about Padilla's possession of the knife. Rawlins said that Padilla never attempted to put his hands in his pockets.

Rawlins admitted that he never felt threatened by Padilla and was not afraid for his own safety at any time during this incident. At no point during the three separate interviews with Detective Kasinger did Rawlins claim to have been hit or kicked by Padilla. Rawlins claimed to Detective Kasinger that he was more afraid of the "unknown" and the safety of others based upon his opinion of how Padilla was acting.

Rawlins told Detective Kasinger that he had worked as a bouncer and/or security officer off and on since 2012. Rawlins stated that he had no formal training but has always been the kind of person who defuses situations rather than going "hands on." Rawlins stated that as a bouncer and security guard, he had dealings with drunk people, and it was his job to make sure the drunk people had a good time just as much as the sober people. Rawlins stated that one of the things he would advise other bouncers to do is to use their radio to summon more bouncers as it was more likely to avoid a physical confrontation. However, when asked why he did not call the police in lieu of creating a physical altercation with Padilla, Rawlins's only response was that the police were frequently called to the store and sometimes did not make it there.

When asked whether he knew the dangers of pushing and/or punching a person, Rawlins admitted to Detective Kasinger that he knew of an altercation between a fellow security officer and another person in which the security officer had been punched, fallen down, and injured severely. Rawlins admitted that he had knocked people out before.

He admitted that he knew anything can happen when punching a person, even including death.

Detective Kasinger testified that Rawlins "did a great job" successfully defusing the situation between Padilla and Mort. When Detective Kasinger asked why Rawlins did not attempt to defuse the situation at the register instead of escalating to a physical altercation, Rawlins did not provide a direct answer.

Detective Lauren Meyer testified that she interviewed Baljavong Singh, the owner of the store. Singh hired Rawlins as an employee to run the store and be a cashier. He did not hire Rawlins to do security or bouncer-type activities. Singh stated that the store policy was to call the police if there was any sort of disturbance with a customer and to not put hands on any customers. Singh stated that Rawlins was provided a copy of this policy.

Detective Meyer also interviewed Christopher Bettancourt, the store manager. He agreed Rawlins was not hired to do any sort of bouncer or security work for the store. Bettancourt confirmed that, although employees are allowed to defend themselves, the store policy was to not engage in any sort of altercation with any customer and instead, if there was a disturbance, to call the police. Bettancourt also confirmed that store employees, including Rawlins, received training on this issue and that the police department phone number was listed right next to the register. Bettancourt told Detective Meyer that Rawlins was his most reliable employee; Rawlins was calm, easygoing and there had never been any complaints from customers.

Testifying for the defense, Officer Jordan Litsey said that when he arrived at the store in response to the 911 call, he saw a knife on the counter and Rawlins told him he provided Padilla with towels.

After extensive argument, the magistrate held Rawlins to answer as charged, finding that the People had met their burden as to implied malice murder. The magistrate found that Rawlins was the initial aggressor; that he did not act in self-defense; and that

6

he did not announce any intent to stop the fight to avail himself of a self-defense claim. The magistrate stated: "The facts that I'm relying upon are [Rawlins] struck [Padilla] three times; once pushed, a second time punching him to the ground, and a third time knocking him unconscious. [Rawlins] admitted prior knowledge of the dangerousness of that type of conduct including [that death could result from] punching. [Rawlins] admitted on prior occasions he was aware of or was involved in situations where others had been knocked unconscious. He also did not act in self-defense. He was not in fear . . . . [¶] . . . [¶] . . . I do find the act was deliberate. [Rawlins] had moments of opportunity to decide to act differently. Those were before he went around the counter, after the first push, after the first punch. He had several opportunities to decide to do something different. [¶] He also, having worked at the store, was very well aware of the surroundings including obstacles such as shelving and other objects that could cause injury to someone who falls."

The magistrate further found that while Rawlins was provoked by something Padilla had said, this provocation did not negate malice sufficient to reduce the charge to voluntary manslaughter as it was not such provocation as "would have caused a person of average disposition to act rashly without due deliberation. In other words, from passion rather than judgment." Finally, the magistrate found that there was no justification for the use of force to eject a trespasser in this case as Rawlins did not have that apparent authority.

Rawlins filed a motion to dismiss his charge pursuant to section 995. A superior court judge granted the request, finding no support for the murder charge under an implied malice theory. Although the superior court agreed there "are a number of things which negate actual self-defense," the court found Rawlins did not escalate the circumstances. Rather, it was clear that "Padilla wanted an aggravated confrontation," and Rawlins met this aggression. The superior court dismissed the charge of second degree murder and issued a holding order for voluntary manslaughter.

7

After considering the People's writ petition challenging the superior court ruling and Rawlins's informal opposition, we issued an order to show cause and stayed further trial court proceedings against Rawlins.

## DISCUSSION

The question this case poses is whether the evidence suffices, for purposes of a preliminary hearing, to hold defendant to answer to a murder charge based on an implied malice theory. The People assert sufficient evidence of implied malice was presented at the preliminary hearing and that the ultimate question of whether Rawlins's actions constituted murder should be left to a jury. Rawlins, the real party in interest, maintains the evidence does not support either holding order issued in this case and he should only be held to answer to a charge of involuntary manslaughter.

*A. Standard of Review*

Although the parties disagree as to the standard of review, the law regarding consideration and review of a motion pursuant to section 995 is clear. The magistrate's job at the preliminary hearing is "to determine whether there is 'sufficient cause' to believe defendant guilty of the charged offense." (*People v. Abelino* (2021) 62 Cal.App.5th 563, 573; see also § 872.) " 'Sufficient cause' " in this context means " 'reasonable and probable cause,' " — in other words, facts that would lead a person "of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (*People v. Uhlemann* (1973) 9 Cal.3d 662, 667.) An information will not be set aside if there is "some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474 (*Rideout*).)

Evidence sufficient to justify a prosecution need not be sufficient to support a conviction. (*People v. Scully* (2021) 11 Cal.5th 542, 582 (*Scully*).) Probable cause "signifies a level of proof below that of proof beyond a reasonable doubt, or even proof by a preponderance of the evidence." (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1189.)

8

Indeed, it is well settled that, when it comes to the required showing for probable cause, the bar is " 'exceedingly low.' " (*People v. Abelino, supra*, 62 Cal.App.5th at p. 573.)

Pursuant to section 995, the court must set aside the information if the defendant has been committed without reasonable or probable cause. (§ 995, subd. (a)(2)(B).) "When we review a section 995 motion, we 'disregard[ ] the ruling of the superior court and directly review[ ] the determination of the magistrate.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 654.) If the magistrate has made factual findings, those findings are conclusive if supported by substantial evidence. (*People v. Slaughter* (1984) 35 Cal.3d 629, 638.) But the magistrate's determination regarding the existence of probable cause "is reviewed as an issue of law." (*Id.* at p. 639.)

Here, the magistrate did not resolve any factual disputes or assess the credibility of the witnesses but instead merely accepted the prosecution's evidence and determined it was sufficient to support the charges against Rawlins, and we find that this is a legal conclusion. (See *People v. Slaughter, supra*, 35 Cal.3d at p. 638; *Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 546 [where "the prosecution witnesses' testimony 'was not inherently improbable, [they were] not significantly impeached, and the [magistrate] made no findings as to [their] demeanor,' [the court] must conclude that the magistrate's remarks are legal conclusions"].) As such, we review the record independently to determine whether the evidence presented at the preliminary hearing constituted sufficient cause to sustain the charges in the information. (*Zemek, supra*, at p. 546; *People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 499.)

*B. Analysis*

Rawlins contends that the magistrate failed to conduct legal analysis required for implied malice and, had it done so, it would not have held Rawlins to answer to the

9

murder charge.[2]  We disagree and conclude there is sufficient cause to believe that the killing constituted second degree murder.

To establish probable cause sufficient to withstand the motion to dismiss pursuant to section 995, " 'the People must make some showing as to the existence of each element of the charged offense.' " (*Scully, supra*, 11 Cal.5th at p. 582.)  "Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)  Malice aforethought can be either express or implied, with the latter defined as "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).)

CALCRIM No. 520 defines the elements of second degree murder as:  (1) the defendant committed an act that caused the death of another; and (2) when the defendant acted, they had a state of mind called malice aforethought.  When the evidence warrants instructing on justifiable or excusable homicide, the People must also prove the defendant killed without lawful excuse or justification.  A defendant had implied malice if:  (1) they intentionally committed the act; (2) the natural and probable consequences of the act were dangerous to human life; (3) at the time they acted, they knew their act was dangerous to human life; and (4) they deliberately acted with conscious disregard for human life.  (CALCRIM No. 520.)

---

[2]  Rawlins further argues that in reviewing the magistrate's holding order, the superior court also erred in essentially characterizing Rawlins as the initial aggressor when the court held him to answer to voluntary manslaughter where the evidence only supported a charge of involuntary manslaughter and there was evidence of mutual combat, self-defense, and that Rawlins had the right to eject a trespasser.  The People also challenge the superior court's ruling, arguing that it erred in applying the "substantial evidence" test in determining the sufficiency of the evidence.  Because our duty is to directly review the determination of the magistrate, we need not consider the arguments as to the superior court's ruling.  (See *People v. San Nicolas, supra*, 34 Cal.4th at p. 654.)

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes." (CALCRIM No. 520, italics omitted.) The standard is subjective — the defendant must have "actually appreciated the risk involved." (*People v. Watson* (1981) 30 Cal.3d 290, 297.) Given that there is rarely direct evidence of subjective awareness, it often must be proved by circumstantial evidence. (See *People v. Superior Court* (*Valenzuela*)*, supra*, 73 Cal.App.5th at p. 502.)

When a homicide is committed by violence, we may place emphasis on whether a weapon likely to produce death was used by the accused. (*People v. Munn* (1884) 65 Cal.211, 213.) "If the means employed be not dangerous to life, or, in other words, if the blows causing death are inflicted with the fist, and there are no aggravating circumstances, the law will not raise the implication of malice aforethought, which must exist to make the crime murder." (*Ibid*.) A fistfight alone, even one resulting in death, does not imply malice absent some additional " 'aggravating circumstance[ ]' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508) (*Cravens*), unless it is "such [a] wanton and brutal use of the hands without provocation as to indicate that they would cause death or serious bodily injury so as to indicate an abandoned and malignant heart." (*People v. Zankich* (1961) 189 Cal.App.2d 54, 67.) A jury may infer such an act was undertaken with the awareness it endangers the life of another "from the circumstances of the attack alone" or from a participant's behavior either in preparation or after completion of the act. (*Cravens*, at p. 511.)

Among the circumstances courts have found relevant in determining whether malice may be inferred are the victim's vulnerability, the number of assailants, the ferocity and duration of the attack, and the unusualness or unexpectedness of the victim's death. These factors were all considered in *Cravens, supra*, 53 Cal.4th 500. In that case, the Supreme Court upheld a murder conviction under an implied malice theory where the defendant's behavior before and during the fight demonstrated "this was not, as defendant suggests, a simple fistfight." (*Id*. at p. 511.) There, the defendant was eager to

11

fight and encouraged his friends to attack the victim. When, at the end of the fight, the defendant "sucker punch[ed]" the victim with an " 'extremely hard' " blow, it forced the victim's "head to hit the pavement with an audible cracking sound that even the neighbors could hear," causing skull fractures. (*Id.* at p. 509.) The victim was vulnerable, not only because he was smaller than the defendant and intoxicated, but also because he was already exhausted by the beating just inflicted by one or more of the defendant's friends. (*Id.* at pp. 504-505, 508.) The court noted that at the time the defendant " 'came flying out' " and " 'coldcocked' " the victim, the victim did not pose a threat and was not behaving in an aggressive manner. Nonetheless, the defendant's actions guaranteed that the victim would fall on the pavement or concrete — a very hard surface — the consequences of which must have been known to the defendant. (*Id.* at p. 509.)

We acknowledge the *Cravens* court examined whether there was substantial evidence to support a conviction, which is different than our task to determine whether the evidence supported sufficient cause to commence prosecution. (Compare *Cravens, supra*, 53 Cal.4th at pp. 507-508 [task on appeal after a conviction is to determine whether the record discloses substantial evidence of both the physical and mental components of implied malice — evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt] with *Rideout, supra*, 67 Cal.2d at p. 474 ["Evidence that will justify a prosecution need not be sufficient to support a conviction. [Citations.] . . . [Citations.] An information will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it"].) Nevertheless, this case and others cited herein provide factors we may consider when examining whether malice may be implied when death occurs during a fistfight.

12

Other courts have also emphasized a defendant's knowledge that a punch will result in the victim's head coming into contact with a hard surface is one factor to consider when determining whether a defendant acted with implied malice. For example, in *People v. Efstathiou* (1941) 47 Cal.App.2d 441, the victim fired the defendant from working in the victim's restaurant. The defendant ran out to follow the victim outside and a fistfight ensued. After the defendant knocked the victim down, the defendant started to walk away but returned to kick the victim. The victim died from a skull fracture as a result of contact with a concrete walk after the blow; the victim's jaw was also fractured. (*Id*. at p. 442.) The appellate court affirmed the defendant's second degree murder conviction, finding that the defendant's pursuit of the victim, especially by running after him, indicated malice and the consequences following a fall upon concrete would have been known to the defendant. (*Id*. at p. 443.)

Similarly, in *People v. Palomar* (2020) 44 Cal.App.5th 969, the intoxicated victim said something racially offensive. The defendant became angry and expressed the intent to " 'fuck homeboy up.' " (*Id.* at p. 972; see *id.* at pp. 971-972.) As the victim left the bar, the defendant approached, punched him once in the head and the victim closed his eyes and fell, hitting his head on the edge of the curb. (*Id*. at pp. 972-973.) The defendant walked away without attempting to assist the victim. The victim died from a " 'very severe brain injury.' " (*Id*. at p. 973.) In affirming the defendant's second degree murder conviction, the appellate court found the physical component of implied malice murder was satisfied when: the defendant targeted a victim who was obviously intoxicated and therefore vulnerable; it was reasonable to infer that the blow delivered by the defendant was a very hard punch because it appeared to have knocked the victim unconscious before he hit the ground; the defendant's conduct guaranteed that if the victim fell, he would fall on a very hard surface, such as the pavement or the concrete curb; and the defendant decked the victim with a sucker punch. (*Id*. at pp. 976-977.) The court further found that the defendant's actions satisfied the mental component of implied

13

malice because the jury could infer defendant's subjective awareness that his conduct endangered the victim's life from the circumstances of the attack alone, the natural consequences of which were dangerous to human life. The court also noted the defendant's behavior before and after the attack further supported the finding of implied malice. (*Id.* at pp. 977-978.)

Rawlins emphasizes the differences between *Cravens* and *Palomar* and the instant case. He argues that in comparison to those cases, his actions demonstrate the absence of implied malice where he did not target a smaller, weaker victim, nor did he "sucker punch" Padilla or continue to strike Padilla after he fell to the ground. He claims his actions were appropriate for being drawn into the fight by Padilla, who "came at Rawlins, kicking and swinging." Rawlins maintains he tried to mitigate the situation by repeatedly backing away from Padilla and ordering him out of the store. Then, after the final blow, unlike the defendants in *Cravens* and *Palomar*, he was not indifferent, callous or even gloating at the result of his actions. Instead, he tried to help by calling 911 and providing towels for Padilla.

The instant case may not have the level of brutality as the defendants exhibited in *Cravens* or *Palomar*, but some of the same factors are present here. In this case, the evidence was sufficient to provide probable cause of the physical component of implied malice murder based on the following. First, the evidence revealed that Padilla was impaired and vulnerable to some degree: his gait was unsteady, he said he was "trippin out," and Rawlins thought Padilla might have had a few drinks. Although Padilla instigated the hostility, Rawlins admitted Padilla never threatened him and that Rawlins was not afraid for his own safety. Instead, Rawlins was the initial aggressor physically. As Padilla stood at the register, Rawlins came around the counter, aggressively invaded Padilla's personal space and forcibly pushed Padilla to the ground. While Padilla defensively tried to swing and kick at Rawlins, he was two to three feet away and his movements were ineffective and did not pose a serious threat to Rawlins. Rawlins

14

ordered Padilla out of the store but rather than retreat and provide an opportunity for Padilla to leave upon standing, Rawlins punched Padilla again, knocking him to the ground. Rawlins delivered his final blow in a similar manner. Rawlins's actions also ensured Padilla would fall on a very hard surface (tile over concrete) or even hit shelves of merchandise, the consequences of which would reasonably have been known to him. As for the mental component of implied malice murder, Rawlins admitted he was subjectively aware of the dangers of pushing and punching someone; he had knocked people out before and recognized that punching someone was dangerous and could lead to death. (See *People v. Watson, supra*, 30 Cal.3d at pp. 296-297 ["a finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved . . ."]; cf. *People v. Toth* (1960) 182 Cal.App.2d 819, 823, 834 [second degree murder conviction affirmed where the defendant severely beat and killed his wife, causing a nine-inch skull fracture; evidence showed the defendant trained as a professional boxer admitted that "one never forgets the skill once it has been mastered"].) Again, we are not called upon to decide guilt, but merely the sufficiency of the evidence to support a reasonable suspicion that defendant may be guilty of second degree murder. (See *Scully, supra*, 11 Cal.5th at p. 582 [evidence sufficient to justify a prosecution need not be sufficient to support a conviction].)

Rawlins attempts to characterize the incident as one involving self-defense where Padilla was the instigator who came into the store looking for a fight and Rawlins merely responded appropriately and exercised his right to eject Padilla as a trespasser. He argues the magistrate erred in finding neither self-defense nor the right to eject a trespasser justified his acts such that he could not be charged with second degree murder. Rawlins maintains that at most, the evidence was sufficient to hold him to answer to a charge of involuntary manslaughter.

At a preliminary hearing, the defendant may offer evidence that is "reasonably likely to establish an affirmative defense, negate an element of a crime charged, or

15

impeach the testimony" of the arresting officers. (§ 866, subd. (a).) Of course, when there is no reasonable or probable cause to believe that a defendant is guilty of second degree murder in light of such evidence, the magistrate should not hold the defendant to answer in the first place, but instead should bring the prosecution to an end at that point. (Cf. *People v. Mower* (2002) 28 Cal.4th 457, 473 [to prevail in a motion to dismiss a charge of cultivation of marijuana under § 995, a defendant must show that he was committed " 'without reasonable or probable cause' " in view of his status as a qualified patient or primary caregiver], superseded by statute on other grounds as stated in *Kirby v. County of Fresno* (2015) 242 Cal.App.4th 940, 958-959.)

Here, there was insufficient evidence of self-defense or the right to eject a trespasser to negate the malice element. (See *People v. Stress* (1988) 205 Cal.App.3d 1259, 1267 [malice is implied when no considerable justification appears or when the circumstances attending the killing show an abandoned or malignant heart].) Rawlins admitted he never felt threatened by Padilla and was not afraid for his own safety. For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend against imminent danger to life or great bodily injury. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) Additionally, while Rawlins repeatedly told Padilla to leave the store, he did not provide Padilla with the opportunity to leave. Rawlins instead stayed in the fight zone and struck Padilla down. Even if he had the right to eject Padilla as a trespasser, his actions as the initial aggressor who repeatedly dealt the only blows in the fight was without justification. (Cf. *Tomblinson v. Nobile* (1951) 103 Cal.App.2d 266, 270 [the respondent had the right to eject trespassers from the premises involved, if the circumstances warranted such action, but he had "authority to use only such force as was reasonably necessary and the brutal use of a 'blackjack' was clearly without justification"].)

There is sufficient cause to believe Rawlins knowingly instigated physical contact with Padilla, appreciating that it posed a significant risk to human life, and consciously

16

disregarded that risk.  Because there is some rational ground for assuming the possibility that implied malice murder has been committed and the accused is guilty of it, the charge must be reinstated.  (See *Rideout, supra*, 67 Cal.2d at p. 474; see also *Scully, supra*, 11 Cal.5th at p. 585 [an information should be "set aside only if there was 'a total absence of evidence' to support a necessary element of that offense"].)

## DISPOSITION

Let a peremptory writ of mandate issue directing respondent superior court, immediately upon receipt of the writ, to vacate the order granting the motion of real party in interest to dismiss count one from the information and to enter a new order denying the motion.  The stay issued by this court on April 24, 2023, is vacated upon the issuance of the remittitur.

/s/
EARL, P. J.

We concur:

/s/
MESIWALA, J.

/s/
KEITHLEY, J.*

---

*       Judge of the Butte County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17